FENNEMORE CRAIG, P.C.
Cathy L. Reece (No. 005932)
Andrew M. Federhar (No. 006567)
Nicolas B. Hoskins (No. 023277)
3003 North Central Avenue
Suite 2600
Phoenix, Arizona 85012-2913
Telephone: (602) 916-5000
Facsimile: (602) 916-5999
Email: creece@fclaw.com
nhoskins@fclaw.com

BROWN RUDNICK LLP
William R. Baldiga (MA Bar No. 542125)
Paul W. Shaw (MA Bar No. 455500)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 856-8200
Facsimile: (617) 289-0420
Email: wbaldiga@brownrudnick.com
pshaw@brownrudnick.com

Attorneys for the City of Glendale, Arizona

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>DEWEY RANCH HOCKEY, LLC,<br><br>COYOTES HOLDINGS, LLC,<br><br>COYOTES HOCKEY, LLC and<br><br>ARENA MANAGEMENT GROUP, LLC,<br><br>Debtors. | Case No. 2:09-bk-09488<br>(Jointly Administered)<br><br>Chapter 11<br><br>**VERIFIED COMPLAINT** |
| THE CITY OF GLENDALE,<br><br>Plaintiff,<br><br>vs.<br><br>COYOTES HOCKEY, LLC,<br><br>Defendant<br>This filing applies to:<br>☐ All Debtors<br>■ Specified Debtors | |

# INTRODUCTION

1. The City of Glendale, Arizona (the "City") brings this action for injunctive relief to maintain the continued and uninterrupted presence of the Phoenix Coyotes hockey team in the City of Glendale. The Phoenix Coyotes (the "Team") are the City of Glendale's National Hockey League ("NHL") professional franchise team and an integral part of the vibrant professional sports culture, civic spirit and economic well-being of the City. This action arises out of the breach by debtor Coyotes Hockey, LLC ("Coyotes Hockey") of an "Arena Management, Use and Lease Agreement" (the "Use Agreement") executed by the parties on November 29, 2001, in which Coyotes Hockey agreed that all Team Home Games, as defined in the Use Agreement ("Home Games"), would be played at the Glendale Arena, now known as the Jobing.com Arena, until at least August 31, 2035.

2. Coyotes Hockey's unlawful conduct in blatantly violating the Use Agreement by agreeing to move the Team to Canada will result in immediate and irreparable harm to the City in the loss of the primary asset of the Arena, the loss of a community asset and major source of entertainment and sports culture to the City and its residents, a loss of employment, tourism and economic benefits to the City and its residents, and damage to the City's goodwill, reputation, business relationships and standing in the community.

3. Absent injunctive relief to enforce the requirement that all Team Home Games be played at the Arena, the City of Glendale will suffer irreparable harm which can not be compensated by monetary damages. Coyotes Hockey has contractually acknowledged that the damages the City would suffer from its failure to comply with its agreement that all Team Home Games be played at the Arena are incapable of estimation and that the City is entitled to injunctive relief to specifically enforce the Team Use Covenant.

## PARTIES

4. Plaintiff City of Glendale is an Arizona municipal corporation with its usual place of business at City of Glendale City Hall, 5850 West Glendale Avenue, Glendale, Arizona.

5. Defendant Coyotes Hockey, LLC is a Delaware limited liability company with its usual place of business at 6751 N. Sunset Blvd., Ste. 200, Glendale, Arizona.

## JURISDICTION AND VENUE

6. On May 5, 2009, Coyotes Hockey, together with affiliated entities, filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in this Court.

7. Coyotes Hockey continues to operate its businesses and manage its properties as debtor-in-possession in accordance with Bankruptcy Code sections 1107 and 1108.

8. The Court has jurisdiction over Coyotes Hockey's bankruptcy case and this Adversary Proceeding under 28 U.S.C. sections 157 and 1334. This matter constitutes a core proceeding under 28 U.S.C. sections 157(b)(2)(A) and (O).

9. Venue of Coyotes Hockey's bankruptcy case and this Adversary Proceeding is proper in this District under 28 U.S.C. sections 1408 and 1409.

## FACTS

A. History and Background

10. The City prides itself as the sports destination for all of Arizona and one of the nation's preeminent sports cities. It is home to the NHL Phoenix Coyotes and NFL Arizona Cardinals, and was the site of the NFL's 2008 Super Bowl. It is also host to the Tostitos Fiesta Bowl, BCS Championship games, and NCAA Division I Men's Basketball Championship West Regional games. In addition, the City boasts spring training baseball for the Los Angeles Dodgers and Chicago White Sox, and AVP Pro Beach Volleyball. The City is also the future home of USA Basketball, the organizing body for Men's and Women's United States Olympic Basketball Teams and many other youth, amateur and

1 professional basketball teams that compete across the nation and internationally.

2     11.    Coyotes Hockey's most significant asset is the Phoenix Coyotes NHL hockey team.

    12.    The Team has played hockey in the Phoenix area for the past 13 years since moving from Winnipeg for the 1996-1997 season.

    13.    In 2001, the City determined that it was in the best interests of Glendale and its residents to facilitate and finance the development of a 17,500 seat arena ("the Arena") dedicated to the Team that would provide additional employment opportunities, increase the City's tax base, be available for other entertainment and sporting events, and stimulate additional development on properties in the vicinity of the Arena.

    14.    The Arena is and was designed to be the anchor to the privately-financed $1 billion Westgate City Center, a 223-acre mixed-used development that will ultimately include up to 8 million square feet of shopping, dining, entertainment, high-end condominiums, parks, and office space. The development is intended to be one of the premier entertainment destinations in the region, attracting a projected 22 million visitors annually upon completion.

B.    <u>The Arena Management, Use and Lease Agreement</u>

    15.    On November 29, 2001, the City entered into an "Arena Management, Use and Lease Agreement" (the "Use Agreement"), with Coyotes Hockey, among others, for the construction and operation of the Arena. (<u>Exhibit A</u>).

    16.    Pursuant to Section 9.5 of the Use Agreement, Coyotes Hockey agreed that the Team would play all Home Games at the Arena, commencing on the opening of the Arena and first Full Hockey Season (as defined in the Use Agreement) and for 30 Full Hockey Seasons thereafter, with the option for an extension for another 12 Full Hockey Seasons at Coyotes Hockey's election.

    17.    Section 9.5 states as follows:

> **Team Use Covenant.** Except as expressly provided otherwise in this Agreement and subject to Section 9.6, the Team covenants and

agrees with the City that the Team shall play all Home Games at the Arena Facility and shall not play any Home Games at any other location, from and after the Home Game Obligation Effective Date and continuing until (i) the last day of the 30th Full Hockey Season after the Home Game Obligation Effective Date if the Team does not exercise its rights under Section 3.2 to extend the Agreement Term for the First Renewal Term; (ii) the last day of the last Hockey Season in the First Renewal Term, if the Team exercises its rights under Section 3.2 to extend the Agreement Term for the First Renewal Term, but does not exercise its rights under Section 3.2 to extend the Agreement Term for the Second Renewal Term; (iii) the last day of the last Hockey Season in the Second Renewal Term, if the Team exercises its rights under Section 3.2 to extend the Agreement Term for both the First Renewal Term and the Second Renewal Term, but does not exercise its rights under Section 3.2 to extend the Agreement Term for the Third Renewal Term: or (iv) the last day of the last Hockey Season in the Third Renewal Term, if the Team exercises its rights under Section 32 to extend the Agreement Term for the First Renewal Term, the Second Renewal Term and the Third Renewal Term.

The failure by the Team to observe or perform any of the Team's obligations under this Section 9.5 shall be a **"Team Use Covenant Default".**

Each of the following shall be deemed to be a Team Use Covenant Default:

(a) except as permitted by the provisions of this Agreement, the Team plays or takes any action to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2);

(b)     except as permitted by the provisions of this Agreement, the Team enters into any contract or agreement which purports to obligate the Team to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2);

(c)     except as permitted by the provisions of this Agreement, the Team notifies the NHL of the Team's intent, or requests the NHL's permission, to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2); or

(d)     except as permitted by the provisions of this Agreement, the Team takes any action that constitutes an anticipatory breach of this Section 9.5.

18.     In making this long-term commitment, Coyotes Hockey agreed in Recital K of the Use Agreement that ". . . the Team's obligation to play Home Games at the Arena Facility, are[sic] unique, and are [sic] integral to the development of properties in the vicinity of the Arena and to the well-being of the City and its residents generally, and, with respect to the Team, are personal to the Team and may be discharged only by the Team."

19.     Coyotes Hockey contractually acknowledged that, in the event of a breach, the City would be entitled to injunctive relief to specifically enforce the Team Use Covenant because the requirement that Home Games be played at the Arena is a unique and integral City asset. Coyotes Hockey also agreed that the damages the City would suffer following a breach of the Team Use Covenant would be incapable of estimation. Coyotes Hockey further agreed that the breach of the Team Use Covenant would have adverse consequences on the development of properties in the vicinity of the Arena. For these reasons, Coyotes Hockey agreed that an award of damages would not be an adequate remedy.

20. Accordingly, section 14.7.1 of the Use Agreement provides as follows:

> **Specific Performance.** The City and the Team acknowledge that (i) the Home Games to be played by the Team at the Arena Facility pursuant to Section 9.5 will be unique, (ii) the aggregate damages that the City will suffer following a Team Use Covenant Default are incapable of estimation due, to a substantial extent, to the adverse consequences a Team Use Covenant Default will have on development of properties in the vicinity of the Arena, and (iii) an award of damages arising from a Team Use Covenant Default, including liquidated damages as contemplated by Section 14.7.2, will not be an adequate remedy. Accordingly, the Team agrees that the City shall be entitled to specific performance of, or other appropriate injunctive relief enforcing, the obligations of the Team under Section 9.5. Notwithstanding any other provision of this Agreement, no cure period provided for in this Agreement shall he [sic] a condition to the City's right to seek such specific performance or other injunctive relief.

C. <u>The City's Reliance on the Team Use Covenant</u>

21. In reliance upon and in consideration of Coyotes Hockey's agreement that the Team would play at the Arena for the 30 year term set forth in the Use Agreement, the City agreed to provide the approximate sum of $183 million to acquire land for, and design, develop, finance and construct, the Arena and certain parking, infrastructure and other public improvements.

22. In further reliance on Coyotes Hockey's commitment that the Team would play all of its Home Games at the Arena for at least the 30 years, and to raise the money for these expenses, the City issued $155 million of Series 2003A and B sales tax bonds in July 2003 under the name Glendale Municipal Property Corporation. Because of the City's agreement with Coyotes Hockey, financing of the Arena's construction could not be entirely tax exempt and $105,260,000 of the funding was issued as taxable debt at an interest rate significantly higher than the then-prevailing rate for tax-exempt debt. This

taxable debt remains outstanding and the City will continue to pay debt service at the taxable rate during the entire period the Team has committed to play in the Arena.

23. The City also issued revenue bonds backed by sales taxes as well as general obligation bonds for roads, sidewalks and other infrastructure around the Arena area. Approximately $28 million was expended by the City itself to develop and build the Arena and related infrastructure.

24. In addition, as a direct consequence of and in reliance on the commitments contained in the Use Agreement, the City expanded its jurisdiction by annexing the land in the vicinity of the Arena, which annexation obligated the City, among other things, to extend public services to the annexed area.

25. Coyotes Hockey knew and had reason to know that the City entered into these obligations in reliance upon the Coyotes Hockey's commitment that the Team be a continued, long-term presence in the City. Indeed, aside from the unquantifiable damage to the sports culture and pride of the City and its residents and to the City's goodwill, reputation, business relationships and standing in the community, the pro forma attached to the Use Agreement projected that the City would realize approximately $800 million in revenue and taxes generated by the Team playing its Home Games in the Arena.

26. The Arena opened its doors on December 26, 2003 and the Team has continuously played Home Games at the Arena since that date.

27. At all times, the Arena has been owned by the City and used by the Team as provided in the Use Agreement.

D.  The Team is a Unique and Irreplaceable Community Asset

28. Since its arrival in 1996, the Team has quickly become an integral part of the character and spirit of the City and the metropolitan Phoenix area. In addition, although some might like to see Wayne Gretzky return to the ice as a player, fans in Phoenix and around the world are excited that the greatest player in the history of the game is affiliated with the Team as partial owner and its Head Coach.

29. The Team is the primary tenant of the Arena. The Team has historically attracted large crowds to its games, building an extensive and loyal fan base in the City, its surrounding communities, and beyond. The Team's regular season stretches from October to April and is extended thereafter should they reach the NHL playoffs for the Stanley Cup. During its regular season, the Team plays a minimum of 41 games at the Arena.

30. No other actual or potential tenant of the Arena can compare to the consistent and enthusiastic attraction of the Team, nor does any other event at the Arena match the national recognition which the Team generates for the City and its residents. As the primary Arena tenant, the City relies upon the continued presence of the Team for the viability of the Arena and many businesses in the surrounding area.

31. Similarly, the City and its residents benefit from the increased business of restaurants, hotels, and transportation providers that result from the Team's presence, together with the attendant positive contribution to the employment, economic health and tax base of the City.

32. In a recent Economic Impact Study commissioned by Coyotes Hockey, the Team's economic impact on the City was conservatively estimated as:
- 540 jobs;
- $199 million in industry output;
- $38 million of "value added" in labor income, property tax income and business taxes; and
- $1.2 million in sales tax revenue.

33. That same Economic Impact Study conservatively estimated the Team's economic impact on Maricopa County as:
- 770 jobs;
- $140 million in industry output; and
- $54 million of "value added" in labor income, property tax income and business taxes.

34. Just prior to the commencement of these chapter 11 cases, Coyotes Hockey was promoting its positive relationship with the City and the Arena. By Coyotes Hockey's own admission:

- the Arena was specifically built for the Team by the City, which contributed $183 million toward its construction;
- the Arena anchors Westgate City Center, which at 223 acres is one of the largest new urban developments in North America;
- Coyotes Hockey was in negotiations with the City to revise the Use Agreement that it believed would result in a positive impact of millions of dollars annually;
- the Use Agreement is favorable and advantageous to Coyotes Hockey by allowing it to retain multiple revenue streams;
- Coyotes Hockey is in a better position than several other NHL teams to grow its revenues while remaining in the City and playing at the Arena; and
- the rapidly expanding population in the Phoenix area that includes a large number of "northerners" who bring their love of hockey to the region, and the available capacity of the Arena, will result in future revenue growth potential.

35. The Team is indisputably a unique and irreplaceable community asset to the City and its more than 250,000 residents.

E. <u>Coyotes Hockey has Breached the Use Agreement by Agreeing To Relocate the Team to Southern Ontario, Canada</u>

36. On May 5, 2009, Coyotes Hockey and certain related affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.

37. On the same day, the Debtors also filed a motion for an order authorizing the sale of substantially all of Coyotes Hockey's assets, including the Team, and approval of an Asset Purchase Agreement ("APA") by and between Coyotes Hockey and PSE Sports & Entertainment LP.

38. The APA, already fully executed by Coyotes Hockey as seller and PSE Sports & Entertainment LP as buyer (the "Buyer"), is a clear and unequivocal breach of the Use Agreement, as the APA states the Buyer's intention and Coyotes Hockey's agreement to have the Team play its Home Games in the location of the Buyer's choice in Southern Ontario, Canada.

39. Additionally, the Debtors' sale motion requests approval of the relocation of the Team to Southern Ontario without mention or regard for its contractual obligations to the City.

40. At no time prior to May 5, 2009 was the City aware that Coyotes Hockey had been negotiating a sale that would move the Team from the City.

F. The Necessity for Injunctive Relief

41. Absent an injunction to enforce the Team Use Covenant set forth above and to prevent the Team from relocating to Southern Ontario, at least until the expiration of the initial term of the Use Agreement, the City is threatened with the loss of the primary asset upon which its investment in the Arena and the surrounding community depends.

42. Additionally, the commercial development known as Westgate City Center was designed to benefit from the events held at the Arena through increased use, which in turn increases sales tax revenues to the City. As a result, the entire City would suffer greatly upon the premature departure of the Team.

43. As set forth above, Coyotes Hockey has acknowledged the economic impact the Team has on the City, on the Westgate City Center and, more broadly, on Maricopa County.

44. The City would also lose a community asset that is a major and unique source of entertainment, pride and spirit which cannot be replaced, and tourism, employment and economic benefits to the community derived from the Team's presence would suffer greatly.

45. The City would also suffer great and immeasurable harm to its goodwill, reputation and standing in the tourism, sporting and entertainment community. It is

unlikely, if not impossible, that the City would be able to attract another NHL team to replace the Team and this important contribution to the sports identity of the City would be lost.

46. The City is part of the greater Phoenix metropolitan area, which is the fifth largest metropolitan area in the country and would be the largest such area without an NHL hockey franchise if Coyotes Hockey were allowed to breach the Team Use Covenant.

47. As set forth above, Coyotes Hockey has contractually acknowledged that the Team is a unique and integral asset and that any breach of the Team Use Covenant will result in incalculable harm with no adequate remedy at law. For these reasons, and to induce the City to build the Arena and the surrounding amenities and community, Coyotes Hockey agreed that the proper remedy for any breach of the Team Use Covenant was specific performance of this essential covenant.

## COUNT I (Breach of Team Use Covenant)

48. The City incorporates each of the foregoing paragraphs as if fully set forth herein.

49. At all times, the City has duly performed all of its duties and obligations under the Use Agreement.

50. Coyotes Hockey, by signing the APA and seeking approval of the APA and its request to relocate the Team to Southern Ontario in this Court, has breached the Team Use Covenant of the Use Agreement.

51. As a result of Coyotes Hockey's breach of the Team Use Covenant, absent the immediate entry of injunctive relief, the City would suffer immediate and irreparable harm in the form of the loss of the primary tenant of the Arena; the loss of a major community asset and a major source of entertainment and sports culture to the City and its residents; a material loss of employment, tourism and economic benefit to the City and its residents; and damage to the City's goodwill, reputation, business relationships and standing in the community.

52. The harm to the City is irreparable and cannot be compensated by monetary damages alone. The City has no adequate remedy at law.

53. The irreparable harm to the City far outweighs any harm to Coyotes Hockey by the enforcement of its promises, to which it agreed and by which it is bound, to continue to play all Home Games at the Arena until the expiration of the initial term of the Use Agreement.

54. The public interest of the residents of the District of Arizona will be served by the issuance of an injunction.

WHEREFORE, the plaintiff City of Glendale respectfully requests that this Court:

(i) Pending a final hearing on the merits, grant a preliminary injunction and enter an order directing Coyotes Hockey, LLC, as well as all persons and entities acting on its behalf, or in concert with it, to specifically perform the contractual obligation of the Team Use Covenant contained in Section 9.5 of the Arena Management, Use and Lease Agreement, and requiring the Phoenix Coyotes hockey team to play all Home Games at the Arena and not play any Home Games at any other location;

(ii) Enjoin Debtor Coyotes Hockey, LLC, as well as its agents, servants and employees, and all others acting in concert or participating with it, from relocating or attempting to relocate the Phoenix Coyotes hockey team to a venue other than the Arena, or taking any actions in furtherance thereof;

(iii) Enjoin the Debtor Coyotes Hockey, LLC, as well as its agents, servants and employees, and all others acting in concert or participating with it, from initiating or engaging in discussions with third parties concerning the relocation of the Phoenix Coyotes hockey team, or taking any actions in furtherance thereof;

(iv) After a hearing on the merits, grant a permanent injunction and enter an order directing Debtor Coyotes Hockey, LLC, as well as all persons and entities acting on its behalf, or in concert with it, to specifically perform the contractual

obligation of the Team Use Covenant contained in Section 9.5 of the Arena Management, Use and Lease Agreement, and requiring the Phoenix Coyotes hockey team to play all Home Games at the Arena and not play any Home Games at any other location until August 31, 2035; and

(v) Grant such further relief as the Court deems equitable and just in the circumstances.

Dated: May 19, 2009

                    FENNEMORE CRAIG, P.C.

By: /s/ Cathy L. Reece   (No. 005932)
    Cathy L. Reece
    Andrew M. Federhar
    Nicolas B. Hoskins
    3003 N. Central Ave., Suite 2600
    Phoenix, AZ  85012-2913
    Telelphone: (602) 916-5343
    Facsimile: (602) 916-5543

                    -and-

BROWN RUDNICK LLP
William R. Baldiga, Esq.
Paul W. Shaw, Esq.
One Financial Center
Boston, MA 02111
Telelphone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel for the City of Glendale, Arizona*

## **VERIFICATION**

I, Craig D. Tindall, City Attorney for the City of Glendale, Arizona, verify that the facts set forth in the foregoing Verified Complaint are true and correct to the best of my knowledge, information and belief. To the extent I do not have personal knowledge of any fact stated herein, I am reliably informed and believe them to be true. This statement is made under the pains and penalties of perjury.

                                                 /s/ Craig. D. Tindall
                                                 Craig D. Tindall

Dated:       May 19, 2009

FENNEMORE CRAIG, P.C.

PHOENIX

| | |
|---|---|
| 1 | This document was electronically filed with the U.S. Bankruptcy Court on this 19th day of May, 2009. |
| 2 | |
| 3 | COPY of the foregoing mailed or emailed the same day to: |
| 4 | |
| 5 | Edward M. Zachary<br>BRYAN CAVE LLP<br>2 N. Central Ave., Suite 2200<br>Phoenix, AZ 85004<br>Edward.zachary@bryancave.com |
| 6 | |
| 7 | |
| 8 | Thomas J. Salerno<br>SQUIRE, SANDERS & DEMPSEY, LLP<br>40 N. Central Ave., Suite 2700<br>Phoenix, AZ 85004<br>tsalerno@ssd.com<br>*Attorneys for Debtors* |
| 9 | |
| 10 | |
| 11 | Steven M. Ambramowitz<br>VINSON & ELKINS LLP<br>666 Fifth Ave., 26th Floor<br>New York, NY 10103-0040<br>sabramowitz@velaw.com |
| 12 | |
| 13 | |
| 14 | Donald L. Gaffney<br>SNELL & WILMER L.L.P.<br>One Arizona Center<br>Phoenix, AZ 85004-2202<br>dgaffney@swlaw.com<br>*Attorneys for SOF Investments, L.P., White Tip Investments, LLC and Donatello Investments, LLC* |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | C. Taylor Ashworth<br>Alan A. Meda<br>STINSON MORRISON HECKER LLP<br>1850 N. Central Ave., Suite 2100<br>Phoenix, AZ 85004<br>tashworth@stinson.com<br>ameda@stinson.com |
| 20 | |
| 21 | |
| 22 | |
| 23 | J. Gregory Milmoe<br>Shepard Goldfein<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>4 Times Square<br>New York, NY 10036<br>Gregory.milmoe@skadden.com<br>Shepard.goldfein@skadden.com |
| 24 | |
| 25 | |
| 26 | |
| 27 | /// |
| 28 | /// |

Anthony W. Clark
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
Wilmington, DE 19899
Anthony.clark@skadden.com
*Attorneys for the National Hockey League*

Lori Lapin Jones
LORI LAPIN JONES PLLC
98 Cutter Mill Rd., Suite 201 North
Great Neck, NY 11021

Albert Turi
General Counsel
BWD GROUP LLC
BWD Plaza
P.O. Box 9050
Jericho, NY 11753-8950
*Attorneys for BWD Group LLC*


   */s/ Susan Stanczak-Ingram*

2198310.1