valuable consideration (whether in money, services, goods or other value). Any Ticket for which (i) the Team, with respect to Hockey Events; (ii) the Arena Manager or the sponsor or promoter with respect to Team Revenue Events, City/Team Revenue Events, City Revenue Events and other Fee Activities that are not Events; or (iii) the City with respect to City Sponsored Events and Community Events, (a) receives no value, or (b) receives money (but not any other services, goods or other value) for such Ticket in an amount less than twenty-five percent (25%) of the retail price stated on the face of such Ticket, shall not be a "Qualified Ticket"; provided, however, that, if the aggregate number of Hockey Tickets described in the immediately preceding clauses (a) and (b) that are distributed by the Team for a given Hockey Event (other than a Hockey-Related Event) exceeds (x) 3,500 with respect to any such Hockey Event during the first three (3) Full Hockey Seasons after the Home Game Obligation Effective Date, (y) 2,625 with respect to any such Hockey Event during the next two (2) Full Hockey Seasons after the Home Game Obligation Effective Date, or (z) 1,750 with respect to any such Hockey Event thereafter, then the Hockey Tickets described in the immediately preceding clauses (a) and (b) distributed by the Team for such Hockey Event that exceed the number stated in the applicable of clause (x), (y) or (z) shall be deemed "Qualified Tickets" for such Hockey Event, unless the City and the Team mutually agree otherwise.

"**Regular Season Game**" means any ice hockey game (i) in which the Team is a participant; (ii) which is scheduled to be played during the portion of the Hockey Season promulgated by the NHL as the regular season; and (iii) which is, under the Hockey Rules, a "home game" of the Team, including, in the Team's sole discretion, any related pre-event, intermission or post-event promotion, competition, performance, autograph session, show or other entertainment or activity presented at the Arena for which there is no admission charge other than the price of the related Hockey Ticket.

"**Related Agreements**" means the Arena Development Agreement, the Mixed-Use Development Agreement, the Safety and Security Agreement and the Team Guaranty.

"**Released Party**" shall have the meaning set forth in Section 10.4.

"**Renewal and Replacement Account**" shall have the meaning set forth in Section 7.6.

"**Renewal and Replacement Contribution**" means, for a given Fiscal Quarter, the payment in the amount designated in the Renewal and Replacement Schedule to be made by the City pursuant to Section 7.6 for such Fiscal Quarter.

"**Renewal and Replacement Schedule**" means a schedule of Renewal and Replacement Contributions (to be agreed to in writing by the City, the Team and the Arena Manager and attached hereto as Exhibit "I" pursuant to that certain Agreement Regarding Renewal and Replacement Schedule dated as of the Agreement Effective Date, by and among the City, the Team and the Arena Manager), as may be amended, from time to time, by agreement among the City, the Team and the Arena Manager hereto.

"**Replacement Arena Manager**" shall have the meaning set forth in Section 14.11.1(d).

"**Retail/Residential Developer**" shall have the meaning set forth in the initial paragraph hereof.

"**Retail/Residential Developer Representative**" shall have the meaning set forth in Section 2.4.

"**Retail/Residential Project**" shall have the meaning set forth in the Mixed-Use Development Agreement.

"**Safety and Security Agreement**" means that certain Safety and Security Agreement in the form attached hereto as Exhibit "J", to be entered into as of the Agreement Effective Date by and among the City, the Arena Manager and the Team.

"**Scheduling Procedures**" means the scheduling procedures for the Arena to be agreed to in writing by the City, the Arena Manager and the Team and attached hereto as Exhibit "C" within thirty (30) days after the Agreement Effective Date, as may be amended, from time to time, by agreement among the City, the Arena Manager and the Team.

"**Second Renewal Term**" shall have the meaning set forth in Section 3.2.2.

"**Substantial Completion**" shall have the meaning set forth in the Arena Development Agreement.

"**Substantial Taking**" shall have the meaning set forth in Section 12.1.

"**Suite**" means any portion of the Arena Facility that is constructed as a "suite" within the Arena Facility and designated by the Team as a "suite", including specialty suites, such as opera suites, party suites and "under stands" suites.

"**Suite License Agreement**" shall have the meaning set forth in Section 5.13(a).

"**Suite License Revenues**" means the gross amount of money received by the Team in connection with the licensing or rental of Suites.

"**Supplemental Recovery Fees**" shall have the meaning set forth in Section 8.2.4.

"**Supplemental User Recovery Charge**" means a charge for all or a portion of the Supplemental Recovery Fee that is separately stated on a Qualified Ticket.

"**Taking**" shall have the meaning set forth in Section 12.1.

"**Taking Date**" shall have the meaning set forth in Section 12.1.

"**Team**" shall have the meaning set forth in the initial paragraph hereof.

"**Team Affiliate Concessions Agreement**" means a Concessions Agreement under which an Affiliate of the Team is the concessionaire.

"**Team Assignee**" shall have the meaning set forth in Section 18.1.5.

"**Team Box Office**" means any room, ticket window or other area in the Arena Facility designed and constructed exclusively for the sale or distribution of Hockey Tickets by Team personnel using Team Equipment.

"**Team Carry-forward Amount**" means, with respect to a given Fiscal Quarter, the amount calculated by subtracting (i) the Actual Team Distribution for such Fiscal Quarter, from (ii) the sum of the Team's Share of City/Team Excess Cash Flow and the Team Excess Cash Flow for such Fiscal Quarter.

"**Team Carry-forward Distribution Percentage**" means, with respect to a given Fiscal Quarter, the percentage calculated by dividing (i) the Outstanding Team Carry-forward Amount for such Fiscal Quarter, by (ii) the sum of the Outstanding City Carry-forward Amount and the Outstanding Team Carry-forward Amount for such Fiscal Quarter.

"**Team Caused Lien**" means any encumbrance, security interest, pledge, claim, mechanics' or other lien arising out of work performed for, materials furnished to, or obligations incurred by the Team in the Team's construction of any Additions and Capital Repairs or other alterations, installations, decorations, additions and improvements pursuant to Section 6.3.2.

"**Team Current Distribution Percentage**" means, with respect to a given Fiscal Quarter, the percentage calculated by dividing (i) the sum of Team's Share of City/Team Excess Cash Flow and the Team Excess Cash Flow for such Fiscal Quarter, by (ii) the Total Excess Cash Flow for such Fiscal Quarter.

"**Team Equipment**" means all furniture, fixtures and other moveable and non-moveable equipment owned or leased by the Team and used by the Team at the Arena.

"**Team Excess Cash Flow**" means, as to a given Fiscal Quarter, the Operating Revenues for all of the Team Revenue Events held during such Fiscal Quarter, less (i) the Operating Expenses; (ii) the Operating Reserve Contributions; and (iii) the Renewal and Replacement Contributions, attributable (or allocated) to such Team Revenue Events for such Fiscal Quarter.

"**Team Guaranty**" shall have the meaning set forth in the Mixed-Use Development Agreement.

"**Team Locker Room**" means the space in the Arena Facility designed and constructed for the exclusive use by the Team as a home team locker room, including dressing, locker, shower, lounge, training, exercise and video coaching areas.

"**Team Office and Storage Space**" means the office space and storage space in the Arena designed and constructed for the exclusive use by the Team for its operations and storage.

"**Team Parking Spaces**" shall have the meaning set forth in Section 8.1.5(a).

"**Team Representative**" shall have the meaning set forth in Section 2.3.

"**Team Retail Store**" means any area or areas in the Arena Facility designed and constructed for the exclusive use by the Team for the operation of Team Sales.

"**Team Revenue Event**" means any of the first fifty (50) revenue-producing Events (other than Hockey Events, Community Events, City Sponsored Events and City Revenue Events) during a given Fiscal Year.

"**Team Sale**" means the sale, furnishing or renting by the Team of apparel, game programs (excluding program Advertising), sporting equipment, novelties and other goods or merchandise (excluding food and beverage items that are not pre-packaged or in a sealed container when sold by the Team) in, at, from or in connection with the operation of the Arena, whether sold, furnished or rented from shops, kiosks or by individual vendors circulating in or at the Arena, including sales to fill orders for any such items by the Team at the Arena (whether received by mail, facsimile, telephone or other medium of communication).

"**Team's Share of City/Team Excess Cash Flow**" means, with respect to a given Fiscal Quarter, fifty percent (50%) of the City/Team Excess Cash Flow for such Fiscal Quarter.

"**Team Use Covenant Default**" shall have the meaning set forth in Section 9.5.

"**Third Renewal Term**" shall have the meaning set forth in Section 3.2.3.

"**Ticket**" means the ticket or other indicia by which admission to the Arena Facility for an Event or other activity at the Arena is permitted and controlled.

"**Total Excess Cash Flow**" means, with respect to a given Fiscal Quarter or Fiscal Year, the sum of (i) the City's Share of City/Team Excess Cash Flow; (ii) the Team's Share of City/Team Excess Cash Flow; (iii) the Team Excess Cash Flow; and (iv) the City Excess Cash Flow, in each case for such Fiscal Quarter or Fiscal Year.

"**User Parking Charge**" means a charge for all or a portion of the City Parking Fee that is separately stated on a Qualified Ticket.

"**Warm-up Session**" means, as applicable, (i) any time period or periods on the date of a Home Game during which the Team and any team playing against the Team in such game use the Arena Facility to prepare for such game, including any "morning skate" period on such day; and (ii) any time period or periods on the date of an All-Star Game during which the teams playing in such game use the Arena Facility to prepare for such game.

1.2     Accounting Terms.  Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP or GAAS, as applicable, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP or GAAS, as applicable.

1.3     Captions.   The captions of articles and sections of this Agreement are for convenient reference only and shall not be deemed to limit, construe, affect, modify or alter the meaning of such articles or sections.

1.4     Cross References.   Any reference in this Agreement to a Section, Subsection, Article, Paragraph or Exhibit is a reference to a Section, Subsection, Article, Paragraph or Exhibit, as appropriate, of this Agreement, unless otherwise expressly indicated.

1.5     Terms.   Whenever the context shall so require, all words herein in any gender shall be deemed to include the masculine, feminine or neuter gender, and all singular words shall include the plural, and all plural words shall include the singular.

The words "herein," "hereof," "hereunder," "hereby," "this Agreement" and other similar references shall mean and include this Agreement and all amendments hereof and supplements hereto unless the context clearly indicates or requires otherwise.

The words "include", "including," and other similar references shall mean "include, without limitation," and "including, without limitation," respectively.

The words "sole discretion" and other similar references shall mean "sole, absolute and unfettered discretion."

1.6     Exhibits.   Each exhibit referred to herein shall be considered a part of this Agreement as fully, and with the same force and effect, as if such exhibit had been included herein in full.

1.7     Language.   The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

## ARTICLE 2

## PARTY REPRESENTATIVES

2.1     City Representative.   The City Manager shall be the City's authorized representative (the "**City Representative**") who shall act as liaison and contact person among the City and the other parties hereto in administering and implementing the provisions of this Agreement. The City Manager shall have the right to designate a substitute City Representative by providing notice of such designation to the other parties hereto. The City Representative, or his authorized designee, shall respond to a request for the City's approval, consent or waiver under this Agreement within ten (10) days after receipt of such request or within such other period as may be expressly required by this Agreement or agreed to in writing by the parties hereto. Except as expressly stated otherwise in this Agreement, the City Representative's failure to respond to any such request within such ten-day or other applicable period shall be conclusively deemed the City's denial of such request.

2.2     Arena Manager Representative.   Steven Ellman shall be the Arena Manager's authorized representative (the "**Arena Manager Representative**") who shall act as liaison and

contact person among the Arena Manager and the other parties hereto in administering and implementing the provisions of this Agreement. The Arena Manager shall have the right to designate a substitute Arena Manager Representative by providing notice of such designation to the other parties hereto. The Arena Manager Representative, or his authorized designee, shall respond to a request for the Arena Manager's approval, consent or waiver under this Agreement within ten (10) days after receipt of such request or within such other period as may be expressly required by this Agreement or agreed to in writing by the parties hereto. Except as expressly stated otherwise in this Agreement, the Arena Manager Representative's failure to respond to any such request within such ten-day or other applicable period shall be conclusively deemed the Arena Manager's denial of such request.

2.3    Team Representative.    Steven Ellman shall be the Team's authorized representative (the "**Team Representative**") who shall act as liaison and contact person among the Team and the other parties hereto in administering and implementing the provisions of this Agreement. The Team shall have the right to designate a substitute Team Representative by providing notice of such designation to the other parties hereto. The Team Representative, or his authorized designee, shall respond to a request for the Team's approval, consent or waiver under this Agreement within ten (10) days after receipt of such request or within such other period as may be expressly required by this Agreement or agreed to in writing by the parties hereto. Except as expressly stated otherwise in this Agreement, the Team Representative's failure to respond to any such request within such ten-day or other applicable period shall be conclusively deemed the Team's denial of such request.

2.4    Retail/Residential Developer Representative.    Steven Ellman shall be the Retail/Residential Developer's authorized representative (the "**Retail/Residential Developer Representative**") who shall act as liaison and contact person among the Retail/Residential Developer and the other parties hereto in administering and implementing the provisions of this Agreement. The Retail/Residential Developer shall have the right to designate a substitute Retail/Residential Developer Representative by providing notice of such designation to the other parties hereto. The Retail/Residential Developer Representative, or his authorized designee, shall respond to a request for the Retail/Residential Developer's approval, consent or waiver under this Agreement within ten (10) days after receipt of such request or within such other period as may be expressly required by this Agreement or agreed to in writing by the parties hereto. Except as expressly stated otherwise in this Agreement, the Retail/Residential Developer Representative's failure to respond to any such request within such ten-day or other applicable period shall be conclusively deemed the Retail/Residential Developer's denial of such request.

2.5    Entertainment Developer Representative.    Steven Ellman shall be the Entertainment Developer's authorized representative (the "**Entertainment Developer Representative**") who shall act as liaison and contact person among the Entertainment Developer and the other parties hereto in administering and implementing the provisions of this Agreement. The Entertainment Developer shall have the right to designate a substitute Entertainment Developer Representative by providing notice of such designation to the other parties hereto. The Entertainment Developer Representative, or his authorized designee, shall respond to a request for the Entertainment Developer's approval, consent or waiver under this Agreement within ten (10) days after receipt of such request or within such other period as may be expressly required by this Agreement or agreed to in writing by the parties hereto. Except as

expressly stated otherwise in this Agreement, the Entertainment Developer Representative's failure to respond to any such request within such ten-day or other applicable period shall be conclusively deemed the Entertainment Developer's denial of such request.

## ARTICLE 3

## AGREEMENT TERM

3.1     Initial Term.  Subject to Section 3.2, the term of this Agreement (the "**Agreement Term**") shall commence on the Agreement Effective Date and shall terminate on the date (the "**Agreement Termination Date**") that is the earlier of (i) the effective date of any termination of this Agreement pursuant to the provisions of this Agreement, or (ii) the ninetieth (90th) day after the last day of the 30th Full Hockey Season after the Home Game Obligation Effective Date; provided, however, that this Agreement shall terminate without further action by any party hereto in the event that (i) the Arena Development Agreement is terminated pursuant to Section 8.3, Section 8.4 or Article 9 of the Arena Development Agreement; or (ii) notwithstanding the application of any Force Majeure, the Operations Start Date has not occurred on or before October 1, 2006.

3.2     Renewal Terms.

3.2.1     First Renewal Term.  The Team shall have the right, which right may be exercised by notice of exercise given by the Team to the City (with a copy to the other parties hereto) not later than one (1) year prior to the scheduled Agreement Termination Date described in Section 3.1, to extend the Agreement Term (and therefore, the Agreement Termination Date) for a period of no more or less than two (2) years (the "**First Renewal Term**").  The Base Team Fee for the First Renewal Term shall be as set forth in Section 9.3.1(a)(iv).

3.2.2     Second Renewal Term.  If the Team timely exercises its right to extend the Agreement Term for the First Renewal Term, the Team shall have the additional right, which right may be exercised in accordance with this Section 3.2.2, to extend the Agreement Term (and therefore, the Agreement Termination Date) for a period of no more or less than five (5) years (the "**Second Renewal Term**").

If the Team desires to exercise its right to extend the Agreement Term for the Second Renewal Term, the Team shall give notice to the City (with a copy to the other parties hereto) of the Team's intent to exercise such right not later than fourteen (14) months prior to the expiration of the First Renewal Term.  The Team and the City shall, promptly after the City's receipt of the Team's notice, engage (with each of the Team and the City paying one-half (½) of the cost incurred in connection with such engagement) an independent consultant experienced in such matters to determine the fair market value of the Team's rights under this Agreement for the Second Renewal Term.  If the Team and the City agree to the fair market value as so determined for the Second Renewal Term within sixty (60) days after the date of the Team's notice, the parties hereto shall execute an amendment to this Agreement setting forth the fair market value as so determined as the Base Team Fee for the Second Renewal Term.  If the Team and the City are unable to agree to the fair market value of the Team's rights under this Agreement for the

Second Renewal Term within such sixty-day period, then this Agreement shall terminate on the last day of the First Renewal Term.

3.2.3    Third Renewal Term.  If the Agreement Term is extended for the Second Renewal Term pursuant to Section 3.2.2, the Team shall have the additional right, which right may be exercised in accordance with this Section 3.2.3, to extend the Agreement Term (and therefore, the Agreement Termination Date) for a period of no more or less than five (5) years (the "**Third Renewal Term**").

If the Team desires to exercise its right to extend the Agreement Term for the Third Renewal Term, the Team shall give notice to the City (with a copy to the other parties hereto) of the Team's intent to exercise such right not later than fourteen (14) months prior to the expiration of the Second Renewal Term.  The Team and the City shall, promptly after the City's receipt of the Team's notice, engage (with each of the Team and the City paying one-half (½) of the cost incurred in connection with such engagement) an independent consultant experienced in such matters to determine the fair market value of the Team's rights under this Agreement for the Third Renewal Term.  If the Team and the City agree to the fair market value as so determined for the Third Renewal Term within sixty (60) days after the date of the Team's notice, the parties hereto shall execute an amendment to this Agreement setting forth the fair market value as so determined as the Base Team Fee for the Third Renewal Term.  If the Team and the City are unable to agree to a fair market value for the Team's rights under this Agreement for the Third Renewal Term within such sixty-day period, then this Agreement shall terminate on the last day of the Second Renewal Term.

Except as otherwise provided in Section 9.3.1(a)(iv), 3.2.2 or 3.2.3 (as applicable) with respect to the Base Team Fee, the terms and conditions of this Agreement for the First Renewal Term, the Second Renewal Term and the Third Renewal Term (as applicable) shall be the same as the terms and conditions of this Agreement as are in effect on the date the Team gives the applicable notice of the Team's exercise of its right to extend the Agreement Term.

## ARTICLE 4

## ENGAGEMENT OF ARENA MANAGER; ARENA MANAGER'S PRE-OPENING RIGHTS AND OBLIGATIONS

4.1    Engagement of Arena Manager.  The City and the Team hereby engage the Arena Manager to be the sole and exclusive manager of the Arena during the period commencing on the Agreement Effective Date and ending on the Agreement Termination Date, with the responsibility for the operation, direction, management and supervision of the Arena and its staff, subject to, and as more fully described in, this Agreement.  The Arena Manager shall have the right, from time to time, to delegate all or a portion of its duties and responsibilities hereunder to a qualified arena manager; provided, however, that (a) the Person to whom such delegation is made (the "**Arena Sub-Manager**") shall comply with all of the Arena Manager's obligations under this Agreement with respect to the duties and responsibilities delegated; (b) such delegation shall not release or discharge the Arena Manager from any of its duties or responsibilities under this Agreement; (c) such delegation shall not increase the amount of the Management Fees; (d) the Arena Sub-Manager shall, prior to the effective date of such

delegation, provide to the City a written guaranty, in form and with content approved by the City, by which the Arena Sub-Manager guarantees payment of Operating Expenses incurred during the period during which such delegation is effective to the extent the Team and the Arena Manager have failed to make the payments required by Section 7.4; and (e) such delegation shall be subject to the approval of the City.

The Arena Manager shall cause any Arena Sub-Manager to perform the duties and responsibilities of the Arena Manager that are delegated to such Arena Sub-Manager in compliance with the Management Performance Standards. If the City claims that the Arena Sub-Manager has failed to comply with the Management Performance Standards, the City shall give the Arena Manager and the Team notice of such claim. The Arena Manager shall, within thirty (30) days after the Arena Manager's receipt of the City's notice, (i) cause the Arena Sub-Manager to cure the failure claimed by the City; (ii) discharge the Arena Sub-Manager and retain a replacement Arena Sub-Manager, subject to the approval of the City; or (iii) discharge the Arena Sub-Manager and assume responsibility for the duties and responsibilities of the Arena Manager that had been delegated to the discharged Arena Sub-Manager.

If the Arena Manager has not retained an Arena Sub-Manager, and the City claims that the Arena Manager has failed to comply with the Management Performance Standards, the Arena Manager shall, within thirty (30) days after the Arena Manager's receipt of the City's notice, (i) cure the failure claimed by the City, or (ii) retain an Arena Sub-Manager, subject to the approval of the City, for the duties and responsibilities of the Arena Manager for which the City claims the Arena Manager has failed to comply with the Management Performance Standards.

4.2    Pre-Opening Obligations.  From and after the Agreement Effective Date and continuing through the Operations Start Date, the Arena Manager shall, in a commercially reasonable manner and in all events consistent with the provisions of this Agreement and the Pre-Opening Budget and in close collaboration with the Team and the City, do all things and take all actions reasonably necessary or appropriate to prepare for the opening of the Arena on the Operations Start Date, including the following:

4.2.1    Within a reasonable time after the Agreement Effective Date, prepare a final pre-opening and start-up budget for review and approval by the Team and the City, for the period from the Agreement Effective Date to the anticipated Operations Start Date. Such budget shall be consistent with the draft pre-opening budget provided by the Team to the City prior to the Agreement Effective Date. The final pre-opening and start-up budget approved by the Team and the City pursuant to this Section 4.2.1 shall be the **"Pre-Opening Budget"**;

4.2.2    Subject to review and approval by the Team, develop user policies and procedures for the Arena, including booking and scheduling policies and procedures (consistent with the Scheduling Procedures); license rates and service fees; forms of service contracts; insurance requirements for users; and rules and regulations for users;

4.2.3    Develop personnel policies and procedures for, and recruit, hire and train, the Arena Manager's personnel, including Event Staff;

4.2.4  Employ, train, pay and supervise, as employees of the Arena Manager and not of the City or the Team, all personnel that are necessary or appropriate to prepare for the opening of the Arena on the Operations Start Date; determine all matters with regard to such personnel, including compensation, bonuses, employee benefit plans, hiring and replacement; and prepare and file when due, all forms, reports and returns required by Applicable Law relating to the employment of such personnel;

4.2.5  Establish charts of accounts and accounting policies, procedures and systems, including polices, procedures and systems for payroll processing, accounts payable, accounts receivable, depository accounts, box office and reporting functions;

4.2.6  Design, establish and maintain effective internal accounting controls with respect to compliance with Applicable Laws, this Agreement and contracts pertaining to the Arena, in such a manner as to minimize the risk of noncompliance and to provide for the detection of any noncompliance within a timely period by the Arena Manager's employees in the normal course of performing their assigned functions;

4.2.7  Establish the Arena Accounts and policies, procedures and systems to ensure compliance with Article 7;

4.2.8  Evaluate computer hardware and software needs and requirements;

4.2.9  Subject to review and approval by the Team, develop emergency plans;

4.2.10  Establish preventive maintenance policies, procedures and systems;

4.2.11  Subject to review and approval by the Team, establish safety policies, procedures and systems for all users of, and employees working at, the Arena;

4.2.12  Acquire all licenses, permits and approvals pertaining to the operation and management of the Arena and required by Applicable Law as and when required, but in any event not later than the Operations Start Date;

4.2.13  Subject to review and approval by the Team, develop and implement pre-opening advertising, marketing, public relations and promotional programs and supporting materials; and

4.2.14  Establish and maintain bookings, calendars and schedules for Events and other activities at the Arena booked or scheduled prior to the Operations Start Date in accordance with the Scheduling Procedures, and use commercially reasonable efforts to schedule and book such Events and other activities at the Arena in accordance with Section 5.6 and the Scheduling Procedures.

# ARTICLE 5

## POST-OPENING MANAGEMENT OF ARENA

5.1    Management.  From and after the Operations Start Date, the Arena Manager shall take all actions necessary for the management of the Arena in accordance with this Agreement, the Management Performance Standards and the applicable Annual Budget, and shall perform the obligations of the Arena Manager described in this Agreement.

Without limiting the generality of the foregoing, the Arena Manager is authorized to and shall, in a commercially reasonable manner and subject to the provisions of Section 7.4 and any and all Licenses, Concessions Agreements, Suite License Agreements, Premium Seat Agreements, Advertising Agreements and Naming Rights Agreements:

(a)    collect Operating Revenues, pay Operating Expenses and collect and deposit into the City Parking Fee Account and the Arena Recovery Fee Account monies to be deposited into such accounts, all in the manner required by this Agreement;

(b)    maintain and furnish, in the manner required by this Agreement, all financial records and information required by this Agreement;

(c)    employ, pay, train and supervise, as employees of the Arena Manager and not of the City or the Team, all personnel that are necessary for the operation of the Arena; determine all matters with regard to such personnel, including compensation, bonuses, employee benefit plans, hiring, training and replacement; and prepare, on the Arena Manager's behalf, and file when due, all forms, reports and returns required by Applicable Law relating to the employment of such personnel;

(d)    other than security to be provided by a Licensee pursuant to a License, provide or arrange for security and paramedics for the Arena for the purpose of maintaining public order and safety in and around the Arena, including the enforcement of safety policies and procedures and the determination of appropriate safety and security staffing levels and patterns, the review and approval of security measures and the exclusion or ejection from the Arena of persons or items in the interest of safety or security.  Such security and paramedics shall be provided pursuant to the Safety and Security Agreement;

(e)    maintain, repair and replace all materials, tools, machinery, equipment and supplies necessary for the operation of the Arena;

(f)    operate and maintain the Arena in good, clean order, condition and repair and in compliance with (i) the Arena Maintenance Standard; (ii) all Applicable Laws; (iii) all NHL requirements in effect from time to time; and (iv) the provisions of this Agreement, and provide for, either directly or by reimbursement, cleaning of, and trash removal for, properties in the vicinity of the Arena following Events and other activities at the Arena;

(g)    coordinate and administer a preventative maintenance program for the Arena;

(h)     coordinate and administer a safety program for the Arena;

(i)     arrange for all utility and other services for the Arena (including electricity for Hockey Events in compliance with applicable NHL requirements and sufficient to light the Arena Facility with the degree of illumination required for color televising and broadcast of Hockey Events), and pay or cause to be paid when due all charges for water, sewer, gas, light, heat, cooling, telephone, electricity and other utilities and services rendered to or used in connection with the operation of the Arena;

(j)     maintain or cause to be maintained all necessary licenses, permits and authorizations for the Arena Manager's management of the Arena in accordance with this Agreement and Applicable Laws;

(k)     furnish to the City the reports and other information regarding the Arena and the management thereof as are required by Section 5.3.3, and such other reports and information as may from time to time be reasonably requested by the City;

(l)     furnish to the Team the reports and other information regarding the Arena and the management thereof as are required by Section 5.3.3, and such other reports and information as may from time to time be reasonably requested by the Team;

(m)     other than Tickets and credentials issued by the Team or any promoter or sponsor of any Event or other activity at the Arena, or any agent thereof, issue all Tickets and credentials for Events and other activities at the Arena;

(n)     verify (and require certificates with respect thereto) that (i) each Licensee has obtained and is maintaining the insurance required by the applicable License; (ii) each concessionaire under a Concessions Agreement has obtained and is maintaining the insurance required by the applicable Concessions Agreement; (iii) the Team has obtained and is maintaining the insurance required to be obtained and maintained by the Team pursuant to this Agreement; and (iv) with respect to each City Sponsored Event and Community Event, the City has obtained the insurance, or has made adequate arrangements for self-insurance, for such Event as required by this Agreement; and

(o)     establish and maintain bookings, calendars and schedules for Events and other activities at the Arena booked or scheduled in accordance with the Scheduling Procedures, and use commercially reasonable efforts to schedule and book such Events and other activities in accordance with Section 5.6 and the Scheduling Procedures.

5.2     Annual Budget.  The Arena Manager shall, not later than the last calendar day of the eighteenth (18th) month after the month during which work commences on the footings and foundations for the Arena Facility, prepare and submit to the City and the Team for their respective review and approval, a proposed partial Annual Budget for the period beginning on the Operations Start Date and ending on the last day of the Fiscal Year during which the Operations Start Date occurs.

Commencing with the first full Fiscal Year after the Operations Start Date and continuing for each Fiscal Year thereafter during the Agreement Term, the Arena Manager shall, at least ninety

(90) days prior to the first day of such Fiscal Year, and after consultation with the Team and the City, prepare and submit to the City and the Team for their respective review and approval a proposed Annual Budget for such Fiscal Year. Each proposed Annual Budget submitted by the Arena Manager pursuant to this Section 5.2 shall be in such format as the Team and the City may reasonably require by notice given to the Arena Manager at least one hundred twenty (120) days prior to first day of such Fiscal Year.

Each of the City and the Team shall review each proposed Annual Budget (and any revised proposed Annual Budget submitted to the City and the Team pursuant to this Section 5.2) and give a notice of approval or disapproval thereof to the Arena Manager (with a copy to the other of the City or the Team, as applicable) within thirty (30) days after receipt of such proposed Annual Budget.

Any notice of disapproval of a given proposed Annual Budget shall state the basis for such disapproval. The failure by the City or the Team to give notice of approval or disapproval within such thirty-day period with respect to a given proposed Annual Budget shall be deemed disapproval of such proposed Annual Budget by such party. If a proposed Annual Budget is deemed disapproved by reason of a party's failure to give such notice of approval or disapproval, the Arena Manager shall have the right to request, and such party shall provide, a statement setting forth such party's objections to such proposed Annual Budget. Upon disapproval or deemed disapproval of a given proposed Annual Budget pursuant to this Section 5.2, the Arena Manager shall revise such proposed Annual Budget and submit the revised proposed Annual Budget to the City and the Team for review and approval or disapproval under this Section 5.2. Beginning with the second full Fiscal Year after the Operations Start Date, if the Annual Budget for a given Fiscal Year is not approved by the City and the Team pursuant to this Section 5.2 prior to the commencement of such Fiscal Year, then the approved Annual Budget for the immediately preceding Fiscal Year, increased by five percent (5%) per line item per Fiscal Year, shall remain in effect until a replacement Annual Budget is approved by the City and the Team pursuant to this Section 5.2 or by an Arbitrator pursuant to Article 16.

The Arena Manager may from time to time, with the prior approval of the City and the Team, revise the approved Annual Budget as reasonably necessary to reflect any unanticipated circumstances. The Arena Manager may from time to time, after notice to the City and the Team, reallocate all or part of the amounts allocated to one or more expense line items in the then applicable Annual Budget so long as such reallocations are not material with respect to any line item and do not increase the total aggregate amount of all of the expense items in such Annual Budget or materially change the projected timing of revenues and expenses.

If circumstances arise that require, in the reasonable opinion of the Arena Manager, unbudgeted expenses (whether as Operating Expenses and/or expenditures for Additions and Capital Repairs), then the Arena Manager may, after ten (10) days' notice to the City and the Team (except in the event of an Emergency, in which event the Arena Manager shall give notice to the City and the Team as soon as is reasonably possible), incur unbudgeted expenses to address such circumstances in an aggregate amount not to exceed, in a given Fiscal Year: (i) $100,000 with respect to Operating Expenses; and (ii) $100,000 with respect to expenditures for Additions and Capital Repairs. If any circumstances require unbudgeted expenses for a given Fiscal Year for either of the categories described in clauses (i) and/or (ii) of the preceding sentence in an amount

which, when added to unbudgeted expenses previously incurred in such Fiscal Year for such category, will exceed the applicable amount stated in the preceding sentence for such category, the Arena Manager shall obtain the City's and the Team's consent to such unbudgeted expenses before incurring such unbudgeted expenses.

The Arena Manager shall, promptly after acquiring knowledge that an Emergency exists, give notice to the City and the Team of the existence of such Emergency and a description of the circumstances of such Emergency. If the Arena Manager determines that Additions and Capital Repairs that are not authorized by this Section 5.2 are required to alleviate such Emergency, the Arena Manager shall promptly request the consent of the City and the Team to make such Additions and Capital Repairs.

The Arena Manager shall, on an ongoing basis during each Fiscal Year, (i) monitor all actual expenses and revenues; (ii) compare such actual revenues and expenses to the corresponding categories of budgeted expenses and revenues for such Fiscal Year; and (iii) promptly give notice to the City and the Team of any circumstances that indicate to the Arena Manager that there may be a need to incur unbudgeted expenses.

The Arena Manager shall, at the request of the City and/or the Team, from time to time make recommendations to the City and the Team regarding methods by which the circumstances requiring unbudgeted expenses may be addressed without incurring such expenses, including making reasonable efforts to curtail or otherwise adjust expenses and/or increase revenues.

The Arena Manager shall, at the request of the City and/or the Team, from time to time prepare and submit to the City and the Team for their respective review and approval a proposed revised Annual Budget for a given Fiscal Year. Any such proposed revised Annual Budget shall be reviewed and approved or disapproved in accordance with the procedures set forth above with respect to the original Annual Budget for such Fiscal Year. If the proposed revised Annual Budget is not approved by the City and the Team pursuant to this Section 5.2, then the approved Annual Budget for such Fiscal Year shall remain in effect until a replacement Annual Budget is approved by the City and the Team pursuant to this Section 5.2 or by an Arbitrator pursuant to Article 16.

    5.3    <u>Records</u>.

        5.3.1    <u>Records</u>. The Arena Manager shall, for a period of five (5) years after the end of the Fiscal Year to which they pertain (or such longer time as may be required by Applicable Law), keep and maintain complete and accurate records (the "**Account Records**") relating to the management and operation of the Arena, including records establishing all amounts received by the Arena Manager (whether as Operating Revenues or otherwise) and all amounts paid by the Arena Manager (whether as Operating Expenses or otherwise) and records relating to the Arena Accounts. "Account Records" shall include any such records maintained by the Arena Sub-Manager, and the Arena Manager shall require the Arena Sub-Manager to comply with the provisions of this Section 5.3.1 and the audit rights of the parties in Section 5.3.4. The Arena Manager shall keep the Account Records separate and identifiable from any other records of the Arena Manager. The Account Records shall be sufficient to establish, with respect to each Fiscal Year, the aggregate Total Excess Cash Flow, the aggregate City/Team

Excess Cash Flow, the aggregate Team Excess Cash Flow and the aggregate City Excess Cash Flow for such Fiscal Year. Upon not less than five (5) Business Days' notice to the Arena Manager and the other parties hereto, each of the City, the Team, the Retail/Residential Developer and the Entertainment Developer (including their respective accountants and attorneys) shall be entitled to inspect the Account Records, during the period the Arena Manager is required to maintain them, at the Arena Manager's office during normal business hours.

The Team shall, for a period of five (5) years after the end of the Fiscal Year to which they pertain (or such longer time as may be required by Applicable Law), keep and maintain complete and accurate records relating to the payments to be made by the Team to the Arena Manager or the City pursuant to this Agreement. Upon not less than five (5) Business Days' notice to the Team and the other parties hereto, each of the City, the Arena Manager, the Retail/Residential Developer and the Entertainment Developer (including their respective accountants and attorneys) shall be entitled to inspect such records (and only such records), during the period the Team is required to maintain them, at the Team's office during normal business hours.

      5.3.2   <u>Accounting Procedures</u>. The Arena Manager shall establish and maintain accounting procedures for the Arena Accounts on an accrual basis, in accordance with GAAP.

      5.3.3   <u>Financial Reports</u>.

      (a)   <u>Report Requirements</u>. The Arena Manager shall cause financial reports to be prepared with such information and at such times as is required by Section 5.3.3(b). Each such financial report shall be prepared in accordance with GAAP. The Arena Manager's independent certified public accounting firm shall be a nationally recognized public accounting firm selected by the Arena Manager and reasonably acceptable to the City and the Team (the "**Accountants**"). Following at least thirty (30) days' notice to the other parties hereto, the Arena Manager may from time to time engage replacement Accountants reasonably acceptable to the City and the Team.

      (b)   <u>Periodic Reports</u>. Commencing on the Operations Start Date and continuing during the Agreement Term, the Arena Manager shall provide to the parties hereto the following financial reports in a format and with a level of detail reasonably agreed to by the parties hereto:

      (i)   <u>Monthly Financial Reports</u>. Not later than the last day of each calendar month, (a) a statement setting forth the prior calendar month's Operating Revenues, Operating Expenses, and expenditures for Additions and Capital Repairs; and (b) a statement setting forth the end of the month balances for each of the Arena Accounts (other than the City Parking Fee Account) and describing the reasons for any Account Transfers (other than withdrawals by the City from the City Parking Fee Account) during the prior calendar month.

      (ii)   <u>Quarterly Financial Reports</u>. Not later than forty-five (45) days after the end of each of the first three (3) Fiscal Quarters of each Fiscal Year, a balance sheet relating to Arena operations as of the end of such Fiscal Quarter, and statements of income and cash flows relating to Arena operations for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter.

(iii)   Annual Financial Reports.  Not later than ninety (90) days after the end of each Fiscal Year, (a) a balance sheet relating to Arena operations as of the end of such Fiscal Year, (b) a statement of profit or loss for Arena operations during such Fiscal Year, and (c) a statement of changes of financial condition for Arena operations during such Fiscal Year, each prepared in accordance with GAAP, and accompanied by an unqualified report containing an opinion of the Accountants, stating that such financial reports fairly present, in all material respects, the activities to which such financial reports relate, that such financial reports have been prepared in accordance with GAAP and that the examination by such Accountants in connection with such financial reports was made in accordance with GAAS.

In connection with the preparation of the Accountants' report required by this Section 5.3.3(b)(iii), the Accountants shall perform certain procedures agreed upon by the parties hereto, for the purpose of verifying that (x) no material amount has been expended by the Arena Manager during the Fiscal Year to which such report pertains for purposes other than purposes authorized by this Agreement or the applicable Annual Budget, and (y) no material amount has been paid or distributed directly or indirectly to or for the benefit of the City, the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer or any Affiliate of the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer, except as authorized by this Agreement or the applicable Annual Budget.  The procedures to be performed shall include (1) an examination of supporting documents for all individual disbursements in excess of $100,000 made by the Arena Manager during such Fiscal Year, and (2) obtaining a statistically valid sample of individual disbursements less than $100,000 made by the Arena Manager during such Fiscal Year.  The parameters to be utilized in determining the statistically valid sample shall be agreed upon by the parties hereto.  The Accountants' report to which this Section 5.3.3(b)(iii) refers shall be accompanied by, or shall include, a statement from the Accountants that the procedures required by this paragraph have been performed and the results of the performance of such procedures.

(iv)   Cash Flow Certifications.  Concurrently with the delivery of the financial reports to which Section 5.3.3(b)(iii) refers, a schedule setting forth (a) the aggregate Total Excess Cash Flow, (b) the aggregate City/Team Excess Cash Flow, (c) the aggregate Team Excess Cash Flow, and (d) the aggregate City Excess Cash Flow for the preceding Fiscal Year, accompanied by a report from the Accountants, stating that such schedule has been fairly stated in all material respects.

5.3.4   Audits.  Each of the City, the Team, the Retail/Residential Developer and the Entertainment Developer (each, an "**Auditing Party**") shall have the right, once within one hundred twenty (120) days after the end of each Fiscal Year (with respect to such Fiscal Year) and once within one hundred twenty (120) days after the Agreement Termination Date (with respect to the last Fiscal Year in the Agreement Term), to conduct an independent audit of the management and operation of the Arena and the Account Records by an independent certified public accounting firm selected by the Auditing Party.  Any such audit shall be conducted after reasonable notice to the Arena Manager and the other parties hereto and at the Arena Manager's office during normal business hours.  Notwithstanding any provisions to the contrary in this Agreement, the Auditing Party's right to conduct such an independent audit within one hundred twenty (120) days after the Agreement Termination Date shall survive any termination of this Agreement.

If any such audit reveals an overpayment or underpayment of any amount to be paid or distributed under this Agreement, then the Auditing Party shall deliver to the other parties hereto a copy of the report of such audit prepared by the Auditing Party's independent certified public accounting firm. Within thirty (30) days after the Arena Manager's receipt of such report, the Arena Manager shall either pay or collect the underpayment or overpayment, as applicable, by (i) making a payment in the case of an underpayment, or (ii) making a demand for reimbursement in the case of an overpayment. If the audit reveals an overpayment to any party hereto, then such party shall make reimbursement of any such overpayment within thirty (30) days after receipt of the Arena Manager's demand for reimbursement.

The Auditing Party shall pay all out-of-pocket costs incurred by the Auditing Party in making any such audit; provided, however, if any such audit reveals a net underpayment to the Auditing Party, a net underpayment to the Arena Manager by any party hereto or a net overpayment by the Arena Manager to any party hereto during a given Fiscal Year that exceeds $100,000 in the aggregate, then the Arena Manager shall reimburse the Auditing Party, out of the Arena Manager's own funds and not as Operating Expenses, such out-of-pocket costs. The Arena Manager shall make such reimbursement within thirty (30) days after the Arena Manager's receipt of a demand by the Auditing Party for such reimbursement.

In the event of a dispute between or among the parties hereto regarding the accuracy of the results of an audit conducted pursuant to this Section 5.3.4, each party to such dispute shall direct its independent certified public accounting firm to consult with the independent certified public accounting firm(s) for the other party(ies) to such dispute to attempt to resolve such dispute. If such accounting firms are unable to resolve such dispute, the parties to such dispute shall engage a neutral, independent certified public accounting firm, mutually acceptable to such parties, to review and resolve such dispute, and the decision by such neutral independent certified public accounting firm shall be binding on all parties hereto, and shall not be subject to Arbitration under Article 16.

Nothing in this Section 5.3.4 shall be construed as a limitation on the City's governmental powers to audit and review tax reports and tax returns.

     5.4    <u>Litigation</u>. The Arena Manager shall deliver to the City and the Team each week a report describing any incidents during the prior week of which the Arena Manager has knowledge (a) involving any injury to any Person at the Arena, or (b) that the Arena Manager reasonably determines are likely to lead to the commencement of one or more legal actions or proceedings by any Person. The Arena Manager shall, promptly after acquiring knowledge of the commencement of any legal action or proceeding relating to the Arena, give any insurer and the other parties hereto notice of such commencement. The Arena Manager shall keep the other parties hereto advised of the status of, and all significant developments in, any such legal action or proceeding. In consultation with the other parties hereto, the Arena Manager shall, in good faith, retain counsel with respect to, defend, settle and/or tender defense to the insurer of, such legal action or proceeding (other than (i) defense of the City in legal actions or proceedings which do not relate to the Arena and in which none of the other parties hereto is a defendant, which defense shall be assumed by the City, (ii) defense of the Team in legal actions or proceedings which do not relate to the Arena and in which none of the other parties hereto is a defendant, which defense shall be assumed by the Team; (iii) defense of the Retail/Residential

Developer in legal actions or proceedings which do not relate to the Arena and in which none of the other parties hereto is a defendant, which defense shall be assumed by the Retail/Residential Developer; (iv) defense of the Entertainment Developer in legal actions or proceedings which do not relate to the Arena and in which none of the other parties hereto is a defendant, which defense shall be assumed by the Entertainment Developer; (v) Challenges, which shall be governed by Section 13.6.2; and (vi) Proceedings, which shall be governed by Section 14.9 and Article 16; with the legal actions described in clauses (i) through (vi) being collectively, the "**Excluded Actions**").

In addition, after consultation with the other parties hereto, the Arena Manager shall, in good faith, retain counsel with respect to, and commence, prosecute and/or settle, such legal actions or proceedings regarding the Arena as are, in the reasonable opinion of the Arena Manager, necessary or required.

All costs and expenses incurred by the Arena Manager in defending, settling and/or prosecuting such legal actions and proceedings (other than Excluded Actions) shall be Operating Expenses. Each of the City, the Team, the Retail/Residential Developer and the Entertainment Developer shall have the right to participate, at their own respective expense, and not as an Operating Expense, in any legal action or proceeding described in this Section 5.4 (other than Excluded Actions).

    5.5    <u>Impositions</u>. The Arena Manager shall pay or cause to be paid, as Operating Expenses, any and all Impositions that accrue after the Operations Start Date and during the Agreement Term, as and when they become due and payable, and before any fine, penalty, interest or cost may be added thereto or become due or be imposed by operation of law for the nonpayment thereof.

The Arena Manager may, with the prior approval of the Team, the Retail/Residential Developer and the Entertainment Developer, contest the legal validity or amount of any Imposition to be paid by the Arena Manager hereunder, may institute such proceedings as the Arena Manager considers necessary therefor and shall prosecute such proceedings to a final determination and/or settle such proceedings with reasonable diligence. If the Arena Manager contests any Imposition, the Arena Manager may withhold or defer payment or make payment of the Imposition under protest so long as such withholding or deferral does not subject the Arena or any portion thereof to a non-curable forfeiture or sale without right of redemption. Any proceedings to contest the validity or amount of any Imposition, or to recover any Imposition paid by the Arena Manager, shall be prosecuted by the Arena Manager. All costs and expenses incurred by the Arena Manager under this Section 5.5 shall be Operating Expenses.

    5.6    <u>Licenses</u>.

        (a)    <u>Arena Manager's Authority</u>. The Team shall have the sole and exclusive right to grant Licenses for the Agreement Term for the benefit of the Team and the City. The Team hereby authorizes the Arena Manager, as the Team's agent and for the benefit of the Team and the City, to negotiate and enter into Licenses subject to and in accordance with the provisions of this Agreement and the Scheduling Procedures, and the Arena Manager shall have the sole and exclusive authority to do so.

(b) <u>Negotiations</u>. The Arena Manager shall make commercially reasonable efforts to seek potential Licenses and to present such potential Licenses to the Team for approval pursuant to this Section 5.6. The Arena Manager shall, prior to negotiating the terms and conditions of a given License, obtain the Team's approval of (i) the proposed use and/or occupancy of the Arena to be authorized by such License; (ii) the identity of the proposed Licensee under such License; and (iii) the proposed manner of providing the Arena Manager with sufficient monies to pay the applicable City Parking Fees and Arena Recovery Fees with respect to the proposed License. The Team may condition such approval on the requirement that the License include any terms or conditions, and/or any standard or other form of License agreement, specified by the Team.

The Arena Manager shall, at the direction of the Team, enter into License negotiations with the party or parties, and for the use and/or occupancy, specified by the Team in such direction. Upon completion of such negotiations, the Arena Manager shall present the proposed License to the Team for approval pursuant to Section 5.6(c).

(c) <u>Approval/Disapproval</u>. Following the Team's approval of, or direction to enter into, negotiations for a proposed License, in each case given pursuant to Section 5.6(b), the Arena Manager shall negotiate and present to the Team for approval pursuant to this Section 5.6(c) the terms and conditions of the proposed License, which shall not, in any event, conflict with any provisions of this Agreement, any other License, or any Concessions Agreement, Suite License Agreement, Premium Seat Agreement, Advertising Agreement or Naming Rights Agreement.

Each License for a Fee Activity shall require that the Licensee pay to the Arena Manager an amount not less than the aggregate City Parking Fee for such Fee Activity. Each License for a Fee Activity shall require that the Licensee pay to the Arena Manager an amount not less than the aggregate Arena Recovery Fees for such Fee Activity.

The Team shall cause each proposed License (and any revised proposed License) submitted to the Team pursuant to this Section 5.6(c) to be reviewed and a notice of approval or disapproval thereof to be given to the Arena Manager within such time as the Arena Manager reasonably designates when the proposed License is submitted to the Team.

If, under the circumstances contemplated by a given License, it is commercially reasonable to do so in order to attract an Event, the Team shall agree in such License to close or limit the operations of the Team Retail Store(s) during the Event that is the subject of such License.

Any notice of disapproval by the Team of a given proposed License shall state the basis for such disapproval. The failure by the Team to give notice to the Arena Manager of approval or disapproval with respect to a given proposed License within the time period designated by the Arena Manager shall be deemed disapproval of such proposed License. If a proposed License is deemed disapproved by reason of the Team's failure to give such notice of approval or disapproval, the Arena Manager shall have the right to request, and the Team shall provide, a statement from the Team setting forth any objections of the Team to such proposed License. Upon disapproval or deemed disapproval of a proposed License pursuant to this Section 5.6(c),

the Arena Manager shall have the right to revise such proposed License and submit the revised proposed License for review by the Team under this Section 5.6(c).

(d) <u>Execution and Performance; Modification and Termination</u>. Following the Team's approval of a proposed License pursuant to Section 5.6(c), the Arena Manager shall (in the name of the Arena Manager and not of the City or the Team) execute the License as so approved and thereafter perform the licensor's obligations under such License. The Arena Manager shall not amend, modify or terminate any License approved by the Team pursuant to Section 5.6(c) without the prior approval of the Team.

(e) <u>Standard for Approval</u>. Any approval or disapproval to be given by the Team or other action by the Team pursuant to this Section 5.6 shall be made and determined by the Team in a commercially reasonable manner.

(f) <u>City Revenue Events</u>. To the extent reasonably possible, the Arena Manager and the Team shall act in a timely manner pursuant to this Section 5.6 in order to afford the City a reasonable opportunity to exercise its rights pursuant to this Section 5.6(f). In the event the Arena Manager or the Team disapproves, or the Team is deemed to have disapproved, any proposed License for an Event pursuant to this Section 5.6, the Arena Manager shall promptly give the City notice (which notice may be oral) of such disapproval or deemed disapproval and the proposed terms and conditions of such License.

Subject to the Scheduling Procedures, all Concessions Agreements, all Suite License Agreements, all Premium Seat Agreements, all Advertising Agreements, all Naming Rights Agreements and the requirements set forth in the second paragraph of Section 5.6(c), the City shall have the right, to the extent the prospective licensee remains willing to enter into a License upon such terms and conditions, to cause the Arena Manager to enter into such proposed License, notwithstanding the disapproval of such proposed License by the Arena Manager or the Team or deemed disapproval of such proposed License by the Team, by giving the Arena Manager and the Team notice of the City's agreement to pay to the Arena Manager the amount by which the Operating Expenses that are incurred or are payable by the Arena Manager in connection with, or that may be reasonably allocated to, the Event contemplated by the proposed License exceeds the Operating Revenues attributable to such Event. The City's notice shall be given to the Arena Manager and the Team within such time as the Arena Manager reasonably designates when the Arena Manager submits the terms and conditions of the proposed License to the City. The Event that is the subject of any License entered into by the Arena Manager pursuant to this Section 5.6(f) shall be a **"City Revenue Event"**.

The Arena Manager shall maintain separate records of all Operating Revenues and all Operating Expenses attributable (or allocated) to each City Revenue Event, and all amounts received for deposit and deposited into the City Parking Fee Account and the Arena Recovery Fee Account with respect to such City Revenue Event.

If the aggregate of the Operating Expenses for all City Revenue Events held during a given Fiscal Quarter exceeds the aggregate of the Operating Revenues for such City Revenue Events, the Arena Manager shall, at the time the quarterly financial report for such Fiscal Quarter is submitted to the parties hereto pursuant to Section 5.3.3(b)(ii), (1) set-off against any

distributions or payments to be made to the City for such Fiscal Quarter pursuant to Section 7.3.1 the amount by which the aggregate of such Operating Expenses exceeds the aggregate of such Operating Revenues (the "**City Revenue Event Shortfall**"), and (2) submit an invoice to the City for reimbursement of the amount, if any, by which the City Revenue Event Shortfall exceeds the amount actually set-off pursuant to clause (1) of this sentence. The City shall reimburse the Arena Manager for the amount set forth in such invoice within thirty (30) days after the date of such invoice. If the City fails to make such reimbursement within such thirty-day period, the Arena Manager shall, in addition to any other rights or remedies of the Arena Manager with respect thereto, have the right to set-off such amount against any future distributions or payments to the City under this Agreement. The Arena Manager shall deposit all amounts received by the Arena Manager pursuant to such invoices in the Operating Account.

In no event shall any License entered into by the Arena Manager pursuant to this Section 5.6(f) be a Team Revenue Event.

(g) <u>Enforcement of Licenses</u>. The Arena Manager shall make commercially reasonable efforts to enforce all Licenses.

(h) <u>Collection and Allocation of Revenues</u>. The Arena Manager shall make commercially reasonable efforts to collect revenues under and generated by all Licenses.

5.7 <u>Team Sales and Concessions</u>.

5.7.1 <u>Team Sales</u>. The Team shall have the sole and exclusive right, at all times during the Agreement Term, to engage in and conduct all Team Sales and to receive, as Exclusive Team Revenues, all revenue therefrom. Accordingly, neither the Arena Manager nor the City shall take any action with respect to, or have any authority over, Team Sales other than at the express direction of the Team. The Team shall bear and pay, from the Team's own monies, all direct expenses attributable to Team Sales, including vendors and other personnel, equipment, costs of goods sold, advertising and promotional costs and rights fees.

5.7.2 <u>Concessions</u>.

(a) <u>Concessions Agreements</u>. The Team shall have the sole and exclusive right to negotiate and enter into all Concessions Agreements for the Agreement Term upon such terms and conditions as the Team, in its sole discretion, deems appropriate; provided, however, that Concessions Agreements for food and beverages shall state that, if it is commercially reasonable to do so in order to attract a given Event (other than a Hockey Event or a Team Revenue Event), the distribution (without charge) of food and beverage samples by a Licensee for such Event shall be permitted during such Event. Neither the Arena Manager nor the City shall take any action with respect to, or have any authority over, Concessions and/or Concessions Agreements, other than as provided in this Agreement with respect to the Arena Manager or at the express direction of the Team.

All payments and other consideration to be made to or provided to the Team pursuant to a given Concessions Agreement shall, to the extent not directly attributable to a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event, a City Revenue Event or a Community Event, be retained by the Team as Exclusive Team Revenues. Notwithstanding the foregoing,

however, the Team agrees that if it negotiates a payment(s) by a concessionaire in lieu of such concessionaire's obligation to build-out and provide fixtures and equipment for such concessionaire's space(s) in the Arena Facility, the Team shall apply such payment(s) in the following order: (i) first, to the costs of building-out, providing fixtures for and equipping concession areas; (ii) second, to reimburse the Arena Developer for costs incurred by the Arena Developer under the Arena Development Agreement in acquiring land for, and designing, developing, financing and constructing, the Arena Facility, the Parking Improvements, the Infrastructure Improvements and the Other Public Improvements to the extent such costs exceed the City Commitment Amount; and (iii) third, to the Team as Exclusive Team Revenues.

The Team shall cause, and each Concessions Agreement shall require that, all payments and other consideration to be made to or provided by the concessionaire under the Concessions Agreement(s) (i) be paid to the Arena Manager, as Operating Revenues, to the extent directly attributable to a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event or a City Revenue Event, and (ii) be paid to the City, to the extent directly attributable to a Community Event. For purposes of this Section 5.7.2(a), only payments or other considerations to be made or provided pursuant to a Concessions Agreement that (i) are calculated solely on the basis of sales made or transactions completed during a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event, a City Revenue Event or a Community Event, or (ii) are payable solely because a given City/Team Revenue Event, Team Revenue Event, City Sponsored Event, City Revenue Event or Community Event is held shall be "directly attributable" to such City/Team Revenue Event, Team Revenue Event, City Sponsored Event, City Revenue Event or Community Event.

The Team shall, within ten (10) days after the execution of a given Concessions Agreement, (i) give to the Arena Manager a copy of such Concessions Agreement, and (ii) give to the City notice of the execution of such Concessions Agreement, the name of the concessionaire that is a party to such Concessions Agreement and the product or services to be offered by such concessionaire under such Concessions Agreement. The Arena Manager shall maintain a copy of each Concessions Agreement during the term of such Concessions Agreement and for a period of five (5) years thereafter (or such longer time as may be required by Applicable Law). The City shall have the right to inspect a copy of each Concessions Agreement, after reasonable notice to the Team and the Arena Manager, at the Arena Manager's office during normal business hours.

(b)     Team Food and Beverage Services.  Subject to the provisions of Section 5.22.3, the Team shall have the right to offer food and/or beverage services directly to consumers at the Arena in lieu of, and/or in addition to, food and/or beverage services that are offered pursuant to Concessions Agreements. In such case, the Team shall, if it is commercially reasonable to do so in order to attract a given Event (other than a Hockey Event or a Team Revenue Event), permit the distribution (without charge) of food and beverage samples by a Licensee for such Event during such Event.

All revenues received by the Team from food and/or beverage services offered by the Team pursuant to this Section 5.7.2(b) shall, to the extent not directly attributable to a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event, a City Revenue Event or a Community Event, be retained by the Team as Exclusive Team Revenues.

The Team shall cause all revenues received by the Team from such food and/or beverage services, less the costs and expenses incurred by the Team in providing such services and a reasonable profit to the Team (consistent with industry standards), (i) to be paid to the Arena Manager, as Operating Revenues, to the extent directly attributable to a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event or a City Revenue Event, and (ii) to be paid to the City, to the extent directly attributable to a Community Event. For purposes of this Section 5.7.2(b), only revenues from such food and/or beverage services (after deduction of such costs, expenses and profit) that (i) are calculated solely on the basis of sales made or transactions completed during a City/Team Revenue Event, a Team Revenue Event, a City Sponsored Event, a City Revenue Event or a Community Event, or (ii) are payable solely because a given City/Team Revenue Event, Team Revenue Event, City Sponsored Event, City Revenue Event or Community Event is held shall be "directly attributable" to such City/Team Revenue Event, Team Revenue Event, City Sponsored Event, City Revenue Event or Community Event.

Notwithstanding anything to the contrary in this Section 5.7.2(b), the provisions of this Section 5.7.2(b) shall not apply to Team Sales.

     5.8    <u>Marketing and Public Relations</u>. The Arena Manager shall, after consultation with the City and the Team, prepare and submit to the City and the Team, for their respective review and approval, marketing, public relations and other promotional programs for the Arena (other than Advertising, Naming Rights and public relations and other promotional programs for Hockey Events, City Sponsored Events and Community Events).

Each of the City and the Team shall review each such proposed program (and any revised proposed program submitted to the City and the Team pursuant to this Section 5.8) and give a notice of approval or disapproval thereof to the Arena Manager (with a copy to the other party hereto) within fifteen (15) Business Days after receipt of such proposed program.

Any notice of disapproval of a given proposed program shall state the basis for such disapproval. The failure by the City or the Team to give notice of approval or disapproval within such fifteen (15) Business Day period with respect to a given proposed program shall be deemed disapproval of such proposed program by such party. If a proposed program is deemed disapproved by reason of a party's failure to give such notice of approval or disapproval, the Arena Manager shall have the right to request, and such party shall provide, a statement setting forth such party's objections to such proposed program. Upon disapproval or deemed disapproval of a given proposed program pursuant to this Section 5.8, the Arena Manager shall revise such proposed program and submit the revised proposed program to the City and the Team for review and approval or disapproval under this Section 5.8.

Following the approval of a given program by the City and the Team, the Arena Manager shall implement such program, and shall (in the name of the Arena Manager and not of the City or the Team) negotiate, execute, perform and enforce all agreements and contracts reasonably required to implement such program.

     5.9    <u>Advertising</u>. The Team shall have the sole and exclusive rights to post, exhibit, display and otherwise present, and to sell and license, all Advertising to be posted, exhibited, displayed and presented during the Agreement Term and to receive, as Exclusive Team

Revenues, all revenue therefrom. Accordingly, neither the Arena Manager nor the City shall take any action with respect to, or have any authority over, the posting, exhibition, display, sale or license of Advertising and/or Advertising Agreements, other than at the express direction of the Team. Notwithstanding any other provision of this Agreement, the Team agrees that it shall cause each Advertising Agreement to include the Advertising Exclusivity Carve-Out; provided, however, that the Team shall have the right, to be exercised in the Team's sole discretion, to exclude the Advertising Exclusivity Carve-Out from certain Advertising Agreements and/or Naming Rights Agreements that, at any given time, do not exceed, in the aggregate, five (5) in number.

The parties hereto acknowledge that, pursuant to the Mixed-Use Development Agreement, the Entertainment Developer has the sole and exclusive rights to post, exhibit, display and otherwise present, and to sell and license, all Parking Advertising to be posted, exhibited, displayed and presented during the Agreement Term.

5.10    Naming Rights.  The Team shall have the sole and exclusive rights to sell and license all Naming Rights to be effective during the Agreement Term and to receive, as Exclusive Team Revenues, all revenue therefrom.  Accordingly, neither the Arena Manager nor the City shall take any action with respect to the sale or license of Naming Rights and/or Naming Rights Agreements, other than at the express direction of the Team.  Notwithstanding any other provision of this Agreement, the Team agrees that it shall cause each Naming Rights Agreement to include the Advertising Exclusivity Carve-Out; provided, however, that the Team shall have the right, to be exercised in the Team's sole discretion, to exclude the Advertising Exclusivity Carve-Out from certain Advertising Agreements and/or Naming Rights Agreements that, at any given time, do not exceed, in the aggregate, five (5) in number.

The Team shall strive to, but does not guarantee that it will be able to, cause the name Glendale to be included in the name of the Arena Facility or a major component thereof.

The parties hereto acknowledge that, pursuant to the Mixed-Use Development Agreement, the Entertainment Developer has the sole and exclusive rights to sell and license all Parking Naming Rights to be effective during the Agreement Term.

5.11    Names, Logo and Schedule.  At the request of the Team, the Arena Manager shall prominently display the Team's name, logo and schedule in areas around the Arena.  The size, location and appearance of such displays shall be developed and mutually agreed upon by the Team and the Arena Manager.  At the request of the City, the Arena Manager shall display the City's name and logo at the Arena in a manner and at a location(s) from time to time agreed upon by the City and the Team.

No display or any other material prepared or permitted by the Arena Manager or the City shall use the name, any logo or any trade or service mark of the Team without the Team's prior consent, which consent may be given or withheld by the Team in its sole discretion.  No display or any other material prepared or permitted by the Arena Manager or the Team shall use the name, any logo or any trade or service mark of the City without the City's prior consent, which consent may be given or withheld by the City in its sole discretion.

5.12    Broadcasts.    The Team has and shall retain the sole and exclusive rights to control, and to receive as Exclusive Team Revenues all revenue from, all radio, television and other media broadcasts, reproductions and transmittals of the pictures, descriptions and accounts of Hockey Events and all other activities of the Team and the visiting teams incidental to Hockey Events, regardless of the nature of the technology or the medium and whether distributed locally, nationally or otherwise.  The Team's rights shall apply to, without limitation, cable television, pay television, direct broadcast satellite television, subscription television, master antenna and satellite antenna television, closed circuit television, Internet and broadband distribution and any other technology now in existence or hereafter developed.  The Team's rights include the right to, from time to time, enter into agreements or other arrangements with other parties (including agreements with "truck producers") pursuant to which such other parties may exercise any or all of the rights of the Team to control and receive revenue from such broadcasts, reproductions, transmittals and distributions.

5.13    Suites and Premium Seats.

(a)    Suite License Agreements.    The Team shall have the sole and exclusive right to enter into contracts or agreements for the license and/or use of Suites during the Agreement Term (each, a "**Suite License Agreement**") upon such terms and conditions as the Team, in its sole discretion, deems appropriate; provided, however, that no Suite License Agreement shall include the right to use the corresponding Suite for Community Events. Accordingly, other than as provided in this Section 5.13(a), neither the Arena Manager nor the City shall take any action or have any authority with respect to the license and/or use of Suites. The Team shall have the sole and exclusive right to receive, as Exclusive Team Revenues, all Suite License Revenues.

Notwithstanding the foregoing paragraph, the Team shall cause each Suite License Agreement to include the following:

(i)    the Exculpatory Language, as required by Section 5.26.1;

(ii)    a commercially reasonable provision requiring that the licensee under such Suite License Agreement execute and deliver, from time to time at the request of the Arena Manager, the Team, the Retail/Residential Developer, the Entertainment Developer and/or the City, accurate estoppel certificates regarding such Suite License Agreement;

(iii)    a commercially reasonable provision requiring that the licensee under such Suite License Agreement obtain and maintain, during the term of such Suite License Agreement, insurance covering any damage to or destruction of the corresponding Suite caused by or attributable to any act or omission of such licensee and/or any agent, employee, guest or invitee of such licensee;

(iv)    a commercially reasonable provision providing that the licensee under such Suite License Agreement shall be liable for any damage to or destruction of the corresponding Suite caused by or attributable to any act or omission of such licensee and/or any agent, employee, guest or invitee of such licensee; and