the Arena Manager from the Licensee under the License for such Fee Activity that remain after the Arena Manager's deposit of City Parking Fees pursuant to Section 8.1.2; provided, however, that the amount so deposited shall not exceed (i) the aggregate Supplemental Recovery Fees for such Fee Activity, if such remaining amounts are sufficient to pay both the Base Recovery Fees and the Supplemental Recovery Fees for such Fee Activity, or (ii) one-half (½) of such remaining amounts, if such remaining amounts are not sufficient to pay both the Base Recovery Fees and the Supplemental Recovery Fees for such Fee Activity. The amount so deposited by the Arena Manager for and on behalf of the City shall not be Operating Revenues.

        8.2.5   <u>Collection of Supplemental Recovery Fee from Qualified Ticket Holders</u>.

        (a)   <u>Hockey Events</u>. The Team shall have the sole and exclusive right, with respect to each Hockey Event, to determine whether there will be a Supplemental User Recovery Charge for such Hockey Event and, if there will be a Supplemental User Recovery Charge for such Hockey Event, the amount of such Supplemental User Recovery Charge.

        (b)   <u>Team Revenue Events, City/Team Revenue Events and City Revenue Events</u>. Each License for a Team Revenue Event, City/Team Revenue Event and City Revenue Event shall state whether there will be a Supplemental User Recovery Charge for such Event and, if there will be a Supplemental User Recovery Charge for such Event, the amount of such Supplemental User Recovery Charge.

        (c)   <u>City Sponsored Events and Community Events</u>. The City shall have the sole and exclusive right, with respect to each City Sponsored Event and each Community Event, to determine whether there will be a Supplemental User Recovery Charge for each such Event and, if there will be a Supplemental User Recovery Charge for each such Event, the amount of such Supplemental User Recovery Charge.

        (d)   <u>Other Fee Activities</u>. Each License for a Fee Activity that is not an Event shall state whether there will be a Supplemental User Recovery Charge for such Fee Activity and, if there will be a Supplemental User Recovery Charge for such Fee Activity, the amount of such Supplemental User Recovery Charge.

        8.2.6   <u>Period of Supplemental Recovery Fee</u>. If the circumstances described in clauses (i) and/or (ii) of the first paragraph of Section 8.2.4 exist, the Supplemental Recovery Fee shall be effective until the last month of the 30th Full Hockey Season after the Home Game Obligation Effective Date.

## ARTICLE 9

## GRANT OF USE RIGHTS AND LEASEHOLD INTEREST; TEAM FEES AND OBLIGATIONS

        9.1   <u>Grant of Use Rights</u>. In addition to the rights granted by the City to the Team in the other provisions of this Agreement, the City hereby irrevocably grants to the Team, from and after the Operations Start Date to and including the Agreement Termination Date, the exclusive right to use and occupy the Hockey Event Spaces during all Hockey Events for Hockey Event Permitted Uses, in accordance with and subject to the terms and conditions set forth in this

Agreement. The Team shall have the exclusive right to use the Hockey Event Spaces for Hockey Event Permitted Uses for a reasonable time before, during and for a reasonable time after the Hockey Event. "**Hockey Event Permitted Uses**" include the following:

(a) Hockey Events;

(b) The use by the media for watching, broadcasting and reporting on Hockey Events and other Team activities; and

(c) The sale and distribution of Hockey Tickets.

Subject to the rights of the Team under this Agreement, the Arena Manager shall retain possession and control of all portions of the Hockey Event Spaces. In exercising its control over the Hockey Event Spaces, the Arena Manager (i) shall not interfere in any material respect with Hockey Event Permitted Uses; and (ii) shall not allow any Person to enter the Hockey Event Spaces during any Hockey Event without a Hockey Ticket.

9.2 <u>Lease of Exclusive Team Spaces</u>. The City and the Team shall, within ten (10) days after the Operations Start Date, confirm in writing the location of the Exclusive Team Spaces, as actually constructed.

In addition to the rights granted by the City to the Team in the other provisions of this Agreement, (i) the City hereby leases the Exclusive Team Spaces to the Team, and the Team leases the Exclusive Team Spaces from the City subject to the Permitted Exceptions, and (ii) the City hereby irrevocably grants to the Team the non-exclusive right to use the common areas at the Arena to be mutually agreed upon by the City and the Team within ten (10) days after the Operations Start Date for reasonably convenient access to and from the Exclusive Team Spaces, all from and after the Operations Start Date to and including the Agreement Termination Date, and in accordance with and subject to the terms and conditions set forth in this Agreement. The Team shall pay all expenses of furnishing the Exclusive Team Spaces.

The Team shall have the right to use the Exclusive Team Spaces for any lawful purpose, consistent with and subject to the provisions of this Agreement.

The Arena Manager shall have the right to enter the Exclusive Team Spaces only as reasonably necessary to perform its obligations under this Agreement upon at least three (3) days' notice to the Team, except in the case of an Emergency, in which event the Arena Manager may enter the Team Spaces upon reasonable notice. In exercising its right of entry to the Exclusive Team Spaces, the Arena Manager shall not interfere in any material respect with the Team's operations or activities.

9.3 <u>Team Payments</u>.

9.3.1 <u>Base Team Fee and Additional Team Fee</u>.

(a) <u>Base Team Fee</u>. As part of the consideration for the rights granted to the Team under this Agreement, the Team shall pay to the City, the following amounts (the "**Base Team Fee**"):

(i)     on the first day of the first month after the Home Game Obligation Effective Date (the "**Fee Commencement Date**") and on the first day of each month thereafter until (but not including) the 20th annual anniversary of the Fee Commencement Date, the amount of $42,708, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount;

(ii)     on the 20th annual anniversary of the Fee Commencement Date and on the first day of each month thereafter until (but not including) the 25th annual anniversary of the Fee Commencement Date, the amount of $91,667, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount;

(iii)     on the 25th annual anniversary of the Fee Commencement Date and on the first day of each month thereafter until the Agreement Termination Date as originally scheduled pursuant to Section 3.1, the amount of $95,833, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount;

(iv)     if the Team exercises its right under Section 3.2.1 to extend the Agreement Term for the First Renewal Term, on the first day of each month during the First Renewal Term, the amount of $100,000, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount;

(v)     if the Agreement Term is extended for the Second Renewal Term pursuant to Section 3.2.2, on the first day of each month during the Second Renewal Term, the amount to be set forth in the amendment to this Agreement to be entered into by the parties hereto pursuant to Section 3.2.2, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount; and

(vi)     if the Agreement Term is extended for the Third Renewal Term pursuant to Section 3.2.3, on the first day of each month during the Third Renewal Term, the amount to be set forth in the amendment to this Agreement to be entered into by the parties hereto pursuant to Section 3.2.3, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount.

(b)     Additional Team Fee.  As part of the consideration for the rights granted to the Team under this Agreement, the Team shall pay to the City, within ten (10) days after the end of each Fiscal Quarter during the Agreement Term (beginning with the first full Fiscal Quarter after the Operations Start Date), an amount equal to the Renewal and Replacement Contribution for such Fiscal Quarter, plus any transaction privilege and excise taxes that the City is required, by Applicable Law, to pay with respect to the City's receipt of such amount (the "**Additional Team Fee**").

9.3.2   Game Payment.  As part of the consideration for the rights granted to the Team under this Agreement, the Team shall pay to the Arena Manager, on the first day of each month during the Agreement Term, the amount determined by multiplying the Game Payment by the sum of the number of Home Games and All-Star Games (if any) in the immediately

preceding calendar month. Each such payment shall be Operating Revenues and shall be deposited by the Arena Manager in the Operating Account. The parties hereto acknowledge that the Team's payment of the Game Payment is intended to and shall be in lieu of any payment or reimbursement by the Team of Operating Expenses incurred in connection with Home Games and All-Star Games (if any), and that the amount of the Game Payment represents the parties' reasonable estimate of the average amount of such Operating Expenses likely to be incurred with respect to a Home Game or All-Star Game.

9.3.3   <u>Arena Manager Employee Theft Payment</u>. If, at any time while the Team is an Affiliate of the Arena Manager, an officer or employee of the Arena Manager misappropriates monies from any of the Arena Accounts, and the proceeds from any fidelity bond or insurance that covers such misappropriation are less than the full amount of the misappropriated monies, then the Team shall pay to the Arena Manager for deposit into the appropriate Arena Account the amount by which such misappropriated monies exceed such proceeds.

9.3.4   <u>City Parking Fee Payment</u>. The Team shall pay to the Arena Manager, within two (2) Business Days after a given Hockey Event, for deposit into the City Parking Fee Account pursuant to Section 8.1.2, the aggregate amount of the City Parking Fees due and payable for such Hockey Event.

9.3.5   <u>Base Recovery Fee Payment</u>. The Team shall pay to the Arena Manager, within two (2) Business Days after a given Hockey Event, for deposit into the Arena Recovery Fee Account pursuant to Section 8.2.3, the aggregate amount of the Base Recovery Fees due and payable for such Hockey Event.

9.3.6   <u>Supplemental Recovery Fee Payment</u>. The Team shall pay to the Arena Manager, within two (2) Business Days after a given Hockey Event, for deposit into the Arena Recovery Fee Account pursuant to Section 8.2.4, the aggregate amount of the Supplemental Recovery Fees (if any) due and payable for such Hockey Event.

9.4   <u>Taxes on Team's Interest</u>.   The Team shall pay prior to delinquency any government property lease excise taxes and similar taxes that may be lawfully imposed on the leasehold interest of the Team under this Agreement.

9.5   <u>Team Use Covenant</u>.   Except as expressly provided otherwise in this Agreement and subject to Section 9.6, the Team covenants and agrees with the City that the Team shall play all Home Games at the Arena Facility and shall not play any Home Games at any other location, from and after the Home Game Obligation Effective Date and continuing until (i) the last day of the 30th Full Hockey Season after the Home Game Obligation Effective Date if the Team does not exercise its rights under Section 3.2 to extend the Agreement Term for the First Renewal Term; (ii) the last day of the last Hockey Season in the First Renewal Term, if the Team exercises its rights under Section 3.2 to extend the Agreement Term for the First Renewal Term, but does not exercise its rights under Section 3.2 to extend the Agreement Term for the Second Renewal Term; (iii) the last day of the last Hockey Season in the Second Renewal Term, if the Team exercises its rights under Section 3.2 to extend the Agreement Term for both the First Renewal Term and the Second Renewal Term, but does not exercise its rights under Section 3.2

to extend the Agreement Term for the Third Renewal Term; or (iv) the last day of the last Hockey Season in the Third Renewal Term, if the Team exercises its rights under Section 3.2 to extend the Agreement Term for the First Renewal Term, the Second Renewal Term and the Third Renewal Term.

The failure by the Team to observe or perform any of the Team's obligations under this Section 9.5 shall be a **"Team Use Covenant Default"**.

Each of the following shall be deemed to be a Team Use Covenant Default:

        (a)    except as permitted by the provisions of this Agreement, the Team plays or takes any action to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2);

        (b)    except as permitted by the provisions of this Agreement, the Team enters into any contract or agreement which purports to obligate the Team to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2);

        (c)    except as permitted by the provisions of this Agreement, the Team notifies the NHL of the Team's intent, or requests the NHL's permission, to play any Home Game at any location other than the Arena Facility during the Agreement Term (as may be extended pursuant to Section 3.2); or

        (d)    except as permitted by the provisions of this Agreement, the Team takes any action that constitutes an anticipatory breach of this Section 9.5.

    9.6    <u>Suspension of Team Use Covenant</u>.  The covenant of the Team to play Home Games at the Arena Facility set forth in Section 9.5 shall be suspended (and the Team shall have the right to play Home Games in any other location) pursuant to Sections 11.4 and 12.4, and during any other time during which Force Majeure prevents or materially interferes with the playing of Home Games at the Arena Facility and/or prevents or materially interferes with the attendance by the public at such Home Games.

If the Team claims that the obligation of the Team to play Home Games at the Arena Facility is suspended under this Section 9.6, the Team shall give notice of such claim to the City within fifteen (15) days after the date on which the Team claims the suspension period commenced. The Team may suspend such obligations immediately upon giving such notice.  Any dispute regarding any claim that the Team is entitled to such a suspension, or the effect of such a suspension, shall be submitted to Arbitration.

If, prior to the last day of the 30th Full Hockey Season after the Home Game Obligation Effective Date, the Team's covenant to play Home Games at the Arena Facility is suspended pursuant to this Section 9.6, and, as a result, the Hockey Season during which such suspension occurs is not a Full Hockey Season, the Agreement Term shall, without action of any party hereto, be extended for a period sufficient to cause the scheduled Agreement Termination Date to be the date that is ninetieth (90th) day after the last day of the 30th Full Hockey Season after the Home Game Obligation Effective Date.

9.7    Team Equipment.  The Team may, at the Team's expense and risk, place such Team Equipment as the Team may from time to time deem necessary or appropriate (i) in the Exclusive Team Spaces at any time, and (ii) in the Hockey Event Spaces at any time during which the Team has the right to use the Hockey Event Spaces pursuant to Section 9.1.  The Team Equipment shall be and remain the property of the Team and may be removed by the Team at any time.  The Team shall be responsible for obtaining, at the Team's expense, whatever insurance covering the Team Equipment the Team deems appropriate.

The City hereby disclaims and waives (to the maximum extent permitted by law) any right to claim a landlord's or any similar lien (including any lien under A.R.S. §§33-361 and 33-362 and any successor provisions) on or with respect to such Team Equipment and other personal property of the Team as may from time to time be placed at the Arena.

9.8    Quiet Enjoyment.  So long as the Team performs all of the Team's obligations under this Agreement, the City shall do nothing (other than the acts permitted or required by this Agreement) that will prevent the Team or its licensees from peaceably and quietly enjoying, using, and occupying the Arena during the Agreement Term in the manner described in this Agreement, and shall defend the Team's quiet enjoyment, use and occupancy of the Arena in the manner described in this Agreement (subject only to the Permitted Exceptions) against the claims of all Persons claiming by, under or through the City.

9.9    City Access.  The City, through appropriate designees, reserves the right to enter the Exclusive Team Spaces, upon reasonable advance notice to the Team and during the Team's regular business hours, to exercise the City's governmental powers and the City's rights under this Agreement; provided, however, that in exercising the City's rights under this Section 9.9, (i) the City shall not unreasonably interfere with the operations of the Team; and (ii) the rights granted to the City hereunder shall not be deemed to either waive or relinquish in any manner any right of the Team under the United States or Arizona Constitutions, or limit in any way the Team's rights to contest the City's actions or findings with respect to any such exercise of the City's governmental powers.

The City, through appropriate designees, reserves the right to enter the portions of the Arena (other than the Exclusive Team Spaces), upon reasonable advance notice to the Team and the Arena Manager and during the Arena Manager's regular business hours or other hours when the Arena Manager is open for business (other than during Events), to exercise the City's governmental powers and the City's rights under this Agreement; provided, however, that in exercising the City's rights under this Section 9.9, (i) the City shall not unreasonably interfere with the operations of the Arena; and (ii) the rights granted to the City hereunder shall not be deemed to either waive or relinquish in any manner any right under the United States or Arizona Constitutions of the Arena Manager, the Team or any Person to whom the Team has granted rights under this Agreement, or limit in any way the Arena Manager's, the Team's or any such Person's rights to contest the City's actions or findings with respect to any such exercise of the City's governmental powers.

9.10    Taxation of Transactions and Activities at Arena.  The parties hereto acknowledge and agree that transactions and activities at the Arena (i) are, and shall continue during the Agreement Term to be, subject to taxes of uniform application throughout the City, (ii) will be

subject to such uniform, City-wide taxes as apply to retail and entertainment activities conducted in the City, and (iii) will be subject to future changes in the tax rates that apply throughout the City. The parties further acknowledge and agree that if (a) the City imposes any tax on transactions and activities at the Arena other than a tax described in the preceding sentence, and (b) the rate of such a tax on transactions and activities at the Arena exceeds the greater of (1) the rate of such a tax applicable to the America West Arena in Phoenix, Arizona, as of the Agreement Effective Date, or (2) the rate of such a tax applicable to the America West Arena as of the date of determination, then the City shall pay to the Team (with respect to Hockey Events) and to the Arena Manager as Operating Revenues (with respect to other Events), within thirty (30) days after the end of the calendar month during which such transactions and activities occur, an amount calculated as follows:

(x) the rate of such a tax on transactions and activities at the Arena,

minus

(y) the greater of (1) the rate of such a tax applicable to the America West Arena as of the Agreement Effective Date, or (2) the rate of such a tax applicable to the America West Arena as of the date of determination,

with the result of the subtraction of (y) from (x) being multiplied by

(z) the taxable revenues generated by transactions and activities subject to such a tax (if the tax rate is a percentage) or the number of such transactions or activities subject to such a tax (if the tax rate is a stated amount per transaction).

## ARTICLE 10

## INSURANCE

10.1  Arena Manager Insurance.  The Arena Manager shall, as an Operating Expense and during the Agreement Term, obtain and cause to be maintained in full force and effect, the insurance and bond coverages described in Exhibit "D" attached hereto.

10.2  City Insurance.  The City shall, at the City's expense and during the Agreement Term, obtain and cause to be maintained in full force and effect, the insurance coverages and/or self-insurance arrangements described in Exhibit "E" attached hereto.

10.3  Team Insurance.  The Team shall, at the Team's expense and during the Agreement Term, obtain and cause to be maintained in full force and effect, the insurance coverages described in Exhibit "F" attached hereto.

10.4  Waiver of Recovery.  Notwithstanding any provision to the contrary in this Agreement, including the provisions of Article 15, no party hereto (a "**Released Party**") shall be liable to any other party hereto, or to any insurance company (by way of subrogation or otherwise) insuring any other party hereto, for any Claim or Loss, even though such Claim or Loss might have been occasioned by the negligence of the Released Party, its agents or

employees, if and to the extent such Claim or Loss is covered by insurance benefiting the party suffering such Claim or Loss or against whom such Claim or Loss is made.

10.5    Failure to Maintain Insurance.

10.5.1 Arena Manager Failure. If the Arena Manager fails or refuses to procure or maintain the insurance required by this Article 10, after notice by the City, the Team, the Retail/Residential Developer or the Entertainment Developer to the Arena Manager of such failure, each of the City, the Team, the Retail/Residential Developer and the Entertainment Developer shall have the right, at its election and at any time prior to its receipt from any other party hereto of evidence of the procurement of such insurance, to procure and maintain such insurance. In such event, any reasonable premium paid by the City, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable), plus interest thereon at the Interest Rate computed from the date such premium is paid, shall be due and payable and reimbursed by the Arena Manager to the City, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) as an Operating Expense, on the first day of the month following the date on which the City, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) provides to the Arena Manager written evidence of payment of such premium.

10.5.2 City Failure. If the City fails or refuses to procure or maintain the insurance required by this Article 10, after notice by the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer to the City of such failure, each of the Arena Manager, the Team, the Retail/Residential Developer and the Entertainment Developer shall have the right, at its election and at any time prior to its receipt from any other party hereto of evidence of the procurement of such insurance, to procure and maintain such insurance, in which event, any reasonable premium paid by the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable), plus interest thereon at the Interest Rate computed from the date such premium is paid, shall:

(a)    if paid by the Arena Manager, be an Operating Expense, and (i) the Arena Manager shall submit an invoice to the City for reimbursement of such payment by the City to the Arena Manager; (ii) the City shall make such reimbursement to the Arena Manager; and (iii) the Arena Manager shall deposit such reimbursement in the Operating Account; or

(b)    if paid by the Team, the Retail/Residential Developer or the Entertainment Developer, be reimbursed by the Arena Manager to the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) as an Operating Expense on demand by the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) accompanied by evidence of payment of such premium, after which (i) the Arena Manager shall submit an invoice to the City for reimbursement of such payment by the City to the Arena Manager; (ii) the City shall make such reimbursement to Arena Manager; and (iii) the Arena Manager shall deposit such reimbursement in the Operating Account.

10.5.3 Team Failure. If the Team fails or refuses to procure or maintain the insurance required by this Article 10, after notice by the Arena Manager, the City, the Retail/Residential Developer or the Entertainment Developer to the Team of such failure, each of

the Arena Manager, the City, the Retail/Residential Developer and the Entertainment Developer shall have the right, at its election and at any time prior to its receipt from any other party hereto of evidence of the procurement of such insurance, to procure and maintain such insurance, in which event, any reasonable premium paid by the Arena Manager, the City, the Retail/Residential Developer or the Entertainment Developer (as applicable), plus interest thereon at the Interest Rate computed from the date such premium is paid, shall:

(a)    if paid by the Arena Manager, be an Operating Expense, and (i) the Arena Manager shall make a demand on the Team for reimbursement of such payment by the Team to the Arena Manager; (ii) the Team shall make such reimbursement to the Arena Manager; and (iii) the Arena Manager shall deposit such reimbursement in the Operating Account; or

(b)    if paid by the City, the Retail/Residential Developer or the Entertainment Developer, be reimbursed by the Arena Manager to the City, the Retail/Residential Developer or the Entertainment Developer (as applicable) as an Operating Expense on demand by the City, the Retail/Residential Developer or the Entertainment Developer (as applicable) accompanied by evidence of payment of such premium, after which (i) the Arena Manager shall make a demand on the Team for reimbursement of such payment by the Team to the Arena Manager; (ii) the Team shall make such reimbursement to the Arena Manager; and (iii) the Arena Manager shall deposit such reimbursement in the Operating Account.

10.6    Notice.  Any party procuring insurance required by this Article 10 pursuant to Section 10.5 after any party hereto fails or refuses to do so shall promptly give notice of such procurement to each other party hereto.

10.7    Provisions.  All insurance required hereby shall be by valid and enforceable policies issued by insurance companies rated not lower than A-VII in Best's Rating Guide (most current edition) and authorized to do business in Arizona.  Each such policy of insurance obtained by a party hereto shall be endorsed:  (a) to provide that the coverage shall not be invalid due to any act or omission of any other party hereto or its agents or employees; (b) except for worker's compensation, to name each other party hereto as an additional insured; (c) to be primary as to any insurance maintained by each other party hereto, so that the latter shall be excess and not contributory to insurance provided by the insuring party; and (d) to provide that the waiver of subrogation set forth above shall not invalidate or have any adverse effect on such insurance policy or liability of the insurer under such policy.  The insurance companies issuing such policy shall agree to notify each other party hereto in writing of any cancellation, alteration or nonrenewal of such policy at least thirty (30) days prior thereto.  Within thirty (30) days before the Operations Start Date and thereafter before a policy period expires, each party required to obtain insurance hereunder shall deliver to each other party hereto certificates evidencing the insurance coverage required of the delivering party pursuant to this Article 10, and consenting to the waiver of subrogation as herein provided.

10.8    Periodic Review and Adjustment.  The parties agree that the insurance required by this Article 10 shall be subject to adjustment from time to time at the reasonable request of the Arena Manager, the Team, the Retail/Residential Developer, the Entertainment Developer or the

City so as to be in such amounts as are customarily provided with respect to comparable multi-purpose sports and entertainment arena facilities. Further, regardless of whether any such requests have been made, the parties shall in good faith review the insurance coverages required by this Article 10 no less frequently than every three (3) years during the Agreement Term, with such reviews to be conducted concurrently with the Annual Budget process described in Section 5.2.

## ARTICLE 11

## DAMAGE OR DESTRUCTION

11.1    Adequately Insured Damage. If, on or after the Operations Start Date, any portion of the Arena is damaged or destroyed, and such damage or destruction is covered by a casualty insurance policy maintained hereunder, all insurance proceeds paid under such casualty insurance policy (the "**Insurance Proceeds**") shall be deposited into the Renewal and Replacement Account. If the Insurance Proceeds are, in the reasonable estimation of the Arena Manager (which estimation is reasonably approved by the Team and the City), sufficient to restore the damaged or destroyed portion of the Arena (i) to a condition as nearly the same as the condition of the Arena immediately prior to such damage or destruction as is reasonably possible; and (ii) in compliance with all applicable NHL requirements and Applicable Law (with the requirements stated in clauses (i) and (ii) being collectively, the "**Casualty Restoration Standard**"), such Insurance Proceeds shall, subject to Section 11.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Casualty Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 11.4.

11.2    Insurance Deficiency and Termination. If, on or after the Operations Start Date, any portion of the Arena is damaged or destroyed, and such damage or destruction is not covered by a casualty insurance policy maintained hereunder or, if so covered, the Insurance Proceeds are insufficient, in the reasonable estimation of the Arena Manager (which estimation is reasonably approved by the Team and the City), to pay the costs of restoration of such damage or destruction in accordance with the Casualty Restoration Standard, and if there are monies in the Renewal and Replacement Account (other than the Insurance Proceeds deposited therein pursuant to Section 11.1), in an amount sufficient, in the reasonable estimation of the Arena Manager (which estimation is reasonably approved by the Team and the City), to pay the costs of such restoration that exceed the Insurance Proceeds, the Insurance Proceeds and such monies shall, subject to Section 11.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Casualty Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 11.4.

If the monies in the Renewal and Replacement Account (after the deposit of the Insurance Proceeds therein) are insufficient to pay the costs of such restoration, then, within ninety (90) days after the date such damage or destruction occurred (the "**Destruction Date**"), the Arena Manager shall give the other parties hereto notice of the amount of the deficiency (the "**Casualty Deficiency**"), and the Team shall, within thirty (30) days after the Team's receipt of the Arena Manager's notice, give notice to the other parties hereto that either (i) the Team will provide,

within thirty (30) days after the Team's receipt of the Arena Manager's notice, additional monies to the Arena Manager in the amount of the Casualty Deficiency, or (ii) the Team intends to terminate this Agreement.

If the Team gives notice that the Team will provide the amount of the Casualty Deficiency, the Team shall provide such amount to the Arena Manager within such thirty-day period. The Arena Manager shall, upon receipt of the amount of the Casualty Deficiency, deposit such amount in the Renewal and Replacement Account, and monies shall, subject to Section 11.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Casualty Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to the provisions of Section 11.4. The Team shall be reimbursed for the amounts provided to the Arena Manager by the Team pursuant to this Section 11.2 (plus interest at the Interest Rate from the date of provision to the date of reimbursement) from the Renewal and Replacement Account, as monies become available from such account.

If the Team gives notice of the Team's intent to so terminate this Agreement, the City shall have the right (within thirty (30) days after the City's receipt of the Team's notice) to give notice to the other parties hereto of the City's intent to pay the amount of the Casualty Deficiency, in which event, the City shall deliver, within thirty (30) days after the date of the City's notice, the amount of the Casualty Deficiency to the Arena Manager for deposit into the Renewal and Replacement Account. Upon such deposit, the Team's notice of the Team's intent to terminate shall be deemed rescinded and void, and monies in the Renewal and Replacement Account shall, subject to Section 11.3, be disbursed to pay the costs of such restoration in accordance with the Casualty Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to the provisions of Section 11.4.

If the City does not give such notice of the City's intent to pay the Casualty Deficiency amount within thirty (30) days after the City's receipt of the Team's notice of the Team's intent to terminate, or does not deliver the Casualty Deficiency amount to the Arena Manager within the thirty-day period for delivery described above, then the Team shall, within fifteen (15) days after the expiration of the applicable thirty-day period, give notice to the other parties hereto that either (i) the Team will provide, within thirty (30) days thereafter, additional monies to the Arena Manager in the amount of the Casualty Deficiency, or (ii) this Agreement shall be terminated.

If the Team gives notice that the Team will provide the amount of the Casualty Deficiency, the Team shall provide such amount to the Arena Manager within such thirty-day period. The Arena Manager shall, upon receipt of the amount of the Casualty Deficiency, deposit such amount in the Renewal and Replacement Account, and monies shall, subject to Section 11.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Casualty Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to the provisions of Section 11.4. The Team shall be reimbursed for the amounts provided to the Arena Manager by the Team pursuant to this Section 11.2 (plus interest at the Interest Rate from the date of provision to the date of reimbursement) from the Renewal and Replacement Account, as monies become available from such account.

If the Team gives notice that this Agreement shall be terminated, then this Agreement shall, without further action or notice by any party hereto, terminate, and the Insurance Proceeds, if any, shall be distributed to the City.

11.3 <u>Damage or Destruction Near End of Agreement Term</u>. If, during the last two (2) Fiscal Years of the Agreement Term, the Arena or any portion thereof is destroyed or damaged to the extent that restoration to the Casualty Restoration Standard will, in the Team's or the City's reasonable estimation, not be completed prior to the commencement of the last Hockey Season during the Agreement Term (as may be extended pursuant to Section 3.2), then the Team or the City shall have the right to terminate this Agreement by giving notice of such termination to the other parties hereto, and the Insurance Proceeds, if any, shall be distributed to the City.

11.4 <u>Abatement of Certain Team Obligations</u>. If the damage or destruction of the Arena or any portion thereof, or the restoration of such damage or destruction to the Casualty Restoration Standard, prevents or materially interferes with the playing of Home Games at the Arena Facility (including by reason of the inadequacy of parking), then, until the Arena has been restored to the Casualty Restoration Standard, the Team shall not be required pursuant to Section 9.5 to play Home Games at the Arena Facility.

## ARTICLE 12

## EMINENT DOMAIN

12.1 <u>Substantial Taking</u>. If, on or after the Operations Start Date, the Arena is taken by right of eminent domain, with or without litigation, or transferred in lieu of or under threat of eminent domain (any such taking or transfer is referred to herein as a "**Taking**"), and the Taking is a Substantial Taking, the Team shall have the right, at its option exercisable at any time within ninety (90) days after the date (the "**Taking Date**") on which the Team receives notice of such Substantial Taking, to terminate this Agreement by notice of termination given by the Team to the other parties hereto. The payment or other award to be paid by the condemnor attributable to the value of the Arena ("**Condemnation Award**") shall be paid to the parties hereto as their interests may appear. "**Substantial Taking**" means a Taking of the Arena that, in the reasonable estimation of Team, will render the Arena unsuitable for the Team's operations as contemplated by this Agreement.

12.2 <u>Partial Taking</u>. If, on or after the Operations Start Date, the Arena is the subject of a Taking that is not a Substantial Taking, or if a Substantial Taking occurs but this Agreement is not terminated as provided in Section 12.1, and the Condemnation Award is, in the reasonable estimation of the Arena Manager (which estimation is approved by the Team), sufficient to restore the remainder of the Arena (i) to a condition as nearly the same as the condition of the Arena immediately prior to such Taking as is reasonably possible; and (ii) in compliance with all applicable NHL requirements and Applicable Law (with the requirements stated in clauses (i) and (ii) being collectively, the "**Condemnation Restoration Standard**"), such Condemnation Award shall, subject to Section 12.3, be deposited in the Renewal and Replacement Account. In such event, the Condemnation Award shall, subject to Section 12.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the

Condemnation Restoration Standard, as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 12.4.

If (a) the Arena is the subject of a Taking that is not a Substantial Taking; (b) the Condemnation Award is, in the reasonable estimation of the Arena Manager (which estimation is approved by the Team), insufficient to pay the costs of restoration of the Arena to the Condemnation Restoration Standard; and (c) monies in the Renewal and Replacement Account (other than the Condemnation Award deposited therein pursuant to the immediately preceding paragraph), are sufficient in the reasonable estimation of the Arena Manager (which estimation is approved by the Team) to pay the amount by which the costs of such restoration exceed the Condemnation Award, the Condemnation Award and such monies shall, subject to Section 12.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Condemnation Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 12.4.

If the monies in the Renewal and Replacement Account (after the deposit of the Condemnation Award therein), are insufficient to pay the costs of such restoration, then, within ninety (90) days after the Taking Date, the Arena Manager shall give the Team notice of the amount of the deficiency (the "**Condemnation Deficiency**"), and the Team shall, within thirty (30) days after the Team's receipt of the Arena Manager's notice, elect to either (i) provide, within thirty (30) days after the Team's receipt of the Arena Manager's notice, additional monies to the Arena Manager in the amount of the Condemnation Deficiency, or (ii) terminate this Agreement by notice of termination to the other parties hereto.

If the Team elects to provide the amount of the Condemnation Deficiency to the Arena Manager, the Arena Manager shall, upon receipt of the amount of the Condemnation Deficiency, deposit such amount in the Renewal and Replacement Account, and monies shall, subject to Section 12.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Condemnation Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 12.4. The Team shall be reimbursed for the amount provided to the Arena Manager by the Team pursuant to this Section 12.2 (plus interest at the Interest Rate from the date of provision to the date of reimbursement) from the Renewal and Replacement Account, as monies become available from such account.

If the Team is entitled to and does elect to so terminate this Agreement, the City shall have the right (within thirty (30) days after the City's receipt of notice of the Team's election to so terminate) to give notice to the other parties hereto of the City's intent to pay the amount of the Condemnation Deficiency, in which event the City shall deliver, within thirty (30) days after the date of the City's notice, the amount of the Condemnation Deficiency to the Arena Manager for deposit into the Renewal and Replacement Account. Upon such deposit, the Team's election to terminate shall be deemed rescinded and void, and monies shall, subject to Section 12.3, be disbursed from the Renewal and Replacement Account to pay the costs of such restoration in accordance with the Condemnation Restoration Standard as soon as is reasonably possible. In such event, this Agreement shall continue in full force and effect, subject to Section 12.4.

If the City does not give such notice of the City's intent to pay the Condemnation Deficiency amount within thirty (30) days after the City's receipt of the Team's notice of election to terminate, or does not deliver the Condemnation Deficiency amount to the Arena Manager within the thirty-day period for delivery described above, this Agreement shall be terminated at the expiration of the applicable thirty-day period, and the Condemnation Award shall be paid to the parties as their interests may appear.

12.3    Partial Taking Near End of Agreement Term. If the Arena is the subject of a Taking during the last two (2) Fiscal Years of the Agreement Term that is not a Substantial Taking, and restoration of the Arena to the Condemnation Restoration Standard will, in the Team's reasonable estimation, not be completed prior to the commencement of the last Hockey Season during the Agreement Term (as may be extended pursuant to Section 3.2), then the Team shall have the right to terminate this Agreement by giving notice of such termination to the other parties hereto, and the Condemnation Award shall be paid to the parties as their interest may appear.

12.4    Abatement of Certain Team Obligations. If a Taking, or the restoration of the Arena to the Condemnation Restoration Standard, prevents or materially interferes with the playing of Home Games at the Arena Facility (including by reason of the inadequacy of parking), then, until the Arena has been restored to the Condemnation Restoration Standard, the Team shall not be required pursuant to Section 9.5 to play Home Games at the Arena Facility.

12.5    No Condemnation by City. Notwithstanding the foregoing, or any other provision of this Agreement, the City covenants, warrants, represents and agrees that it shall not, at any time during the Agreement Term, initiate, engage in, undertake, attempt or pursue, either singly or in combination with any other governmental entity(ies), a condemnation proceeding by right of eminent domain with respect to any portion of the Arena, except for Takings that are for the purpose of acquiring additional right-of-way or utility easements and that do not involve a Substantial Taking.

## ARTICLE 13

## REPRESENTATIONS, WARRANTIES AND COVENANTS

13.1    Arena Manager Representations, Warranties and Covenants. The Arena Manager represents and warrants to, and covenants with, the other parties hereto as follows:

13.1.1    Organization; Authorization. The Arena Manager is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; the Arena Manager has all requisite power and authority to enter into this Agreement; and the execution, delivery and consummation of this Agreement by the Arena Manager have been duly authorized.

13.1.2    No Violation. The execution, delivery and performance of this Agreement by the Arena Manager will not result in the breach of or constitute a default under any loan or credit agreement, or any other agreement, instrument, judgment or decree, to which the Arena Manager is a party or by which the Arena Manager or its assets may be bound or affected. All consents and approvals of any Person (including members of the Arena Manager) required in

connection with the Arena Manager's execution, delivery and performance of this Agreement have been obtained.

13.1.3 <u>Litigation</u>. Other than as disclosed by the Arena Manager to the other parties hereto, no suit is pending against the Arena Manager which could have a material adverse affect upon the Arena Manager's performance under this Agreement. There are no outstanding judgments against the Arena Manager which could have a material adverse affect upon the Arena Manager's performance under this Agreement.

13.1.4 <u>No Conflicts</u>. This Agreement is not prohibited by, and does not conflict with, any other agreement, judgment or decree to which the Arena Manager is a party or is otherwise subject.

13.1.5 <u>No Violation of Laws</u>. As of the Agreement Effective Date, the Arena Manager has received no notice asserting any noncompliance in any material respect by the Arena Manager with Applicable Law relating to the transactions contemplated hereby; and the Arena Manager is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other Governmental Authority which is in any respect material to the transactions contemplated hereby.

13.1.6 <u>Single Purpose Entity</u>. The Arena Manager's articles of organization provide that the Arena Manager's sole purpose and authorized activity is to manage the Arena in accordance with, and to perform the Arena Manager's other obligations under, this Agreement, and the Arena Manager shall not, during the Agreement Term, amend or revise such articles to permit the Arena Manager to have any other purpose or engage in any other activity. As of the Agreement Effective Date and throughout the Agreement Term, the Arena Manager shall be a single purpose entity, whose only purpose and activity shall be to manage and operate the Arena.

13.2 <u>Team Representations, Warranties and Covenants</u>. The Team represents and warrants to, and covenants with, the other parties hereto as follows:

13.2.1 <u>Organization; Authorization</u>. The Team is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; the Team has all requisite power and authority to enter into this Agreement; and the execution, delivery and consummation of this Agreement by the Team have been duly authorized.

13.2.2 <u>No Violation</u>. The execution, delivery and performance of this Agreement by the Team will not violate the NHL Constitution or Bylaws or any written rule, regulation or policy of the NHL, or result in the breach of or constitute a default under any loan or credit agreement, or any other agreement, instrument, judgment or decree, to which the Team is a party or by which the Team or its assets may be bound or affected. All consents and approvals of any Person (including members of the Team) required in connection with the Team's execution, delivery and performance of this Agreement have been obtained.

13.2.3 <u>Litigation</u>. Other than as disclosed by the Team to the other parties hereto, no suit is pending against the Team which could have a material adverse affect upon the Team's performance under this Agreement. There are no outstanding judgments against the Team which could have a material adverse affect upon the Team's performance under this Agreement.

13.2.4 <u>No Conflicts</u>.  This Agreement is not prohibited by, and does not conflict with, any other agreement, judgment or decree to which the Team is a party or is otherwise subject.

13.2.5 <u>No Violation of Laws</u>.  As of the Agreement Effective Date, the Team has received no notice asserting any noncompliance in any material respect by the Team with Applicable Law relating to the transactions contemplated hereby; and the Team is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other Governmental Authority which is in any respect material to the transactions contemplated hereby.

13.2.6 <u>Team Ownership; NHL Good Standing</u>.  The Team is a member, in good standing, of the NHL and holds the franchise from the NHL for the operation of an NHL hockey team currently bearing the designation "Phoenix Coyotes".  The Team shall maintain such franchise in good standing with the NHL at all times during the Agreement Term.

13.3 <u>City Representations, Warranties and Covenants</u>.  The City represents and warrants to, and covenants with, the other parties hereto as follows:

13.3.1 <u>Authority</u>.  The execution, delivery and performance of this Agreement by the City have been duly authorized by the Glendale City Council, and no additional or further act by any other Governmental Authority is required to authorize such execution, delivery and performance.

13.3.2 <u>No Conflicts</u>.  This Agreement is not prohibited by, and does not conflict with, any other agreement, judgment or decree to which the City is a party or is otherwise subject.

13.3.3 <u>No Violation of Laws</u>.  The execution, delivery and performance of this Agreement by the City will not violate the City Charter, the Glendale City Code or any other ordinance or resolution of the City.  As of the Agreement Effective Date, the City has not received any notice asserting any noncompliance in any material respect by the City with Applicable Law relating to the transactions contemplated hereby; and the City is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other Governmental Authority which is in any respect material to the transactions contemplated hereby.

13.3.4 <u>Litigation</u>.  Other than as disclosed by the City to the other parties hereto, no suit is pending against the City which could have a material adverse affect upon the City's performance under this Agreement.  There are no outstanding judgments against the City which could have a material adverse affect upon the City's performance under this Agreement.

13.3.5 <u>Non-Competition</u>.  During the Agreement Term, the City agrees that it shall not directly or indirectly, other than in the exercise of the City's governmental, legislative, judicial and/or regulatory powers, own, manage, operate, control, finance, sponsor, develop, provide City-owned land for or in any other way participate in any indoor or outdoor sports, entertainment or multi-use facility (each a "**Competing Facility**") that either (i) is used by any professional major or minor hockey league or team; or (ii) has an attendance capacity in excess

of 5,000 seats, is located within the City of Glendale, Arizona and is a facility to which the general public is invited, with or without charge, for concerts, sports, entertainment and other events of the kind typically booked at arenas comparable to the Arena Facility in the ordinary course of operations thereof (each a "**Comparable Event**"). Notwithstanding the foregoing, however, the City may do the above with respect to:

> (a)     Any Cactus League or Minor League baseball facility;

> (b)     All parks and open areas not designed or used primarily for events that compete with Events;

> (c)     Aquatic facilities for water sport events;

> (d)     Any facility within the City that is in existence or for which construction has commenced as of the date of the Agreement Effective Date;

> (e)     Any convention facility, civic center or performing arts facility;

> (f)     Any open air stadium or sports facility (including a stadium or sports facility with a retractable or movable roof) if the City's participation in such stadium or sports facility is approved by the Team); and

> (g)     Any other facility that does not book events that compete with the Arena Facility.

13.3.6 <u>Enforcement</u>. The City agrees that the benefits that the Team will receive from the City's covenants in Section 13.3.5 are of a kind for which there is no adequate remedy at law and for which money damages will not be adequate compensation. Therefore, the City agrees that, if the City breaches the covenants of Section 13.3.5, the Team shall have the right, subject to Article 16, to seek specific performance of, or other appropriate injunctive relief enforcing, the obligations of the City under Section 13.3.5.

The covenants of the City in Section 13.3.5 shall be construed as an agreement independent of any other provision in this Agreement. Any and all reasonable costs paid or incurred by the Team to enforce the provisions of Section 13.3.5 shall be reimbursed by the City to the Team on demand by the Team accompanied by evidence of payment of the amount of such costs. If the City fails to make such reimbursement within thirty (30) days of the Team's demand, the Team shall, in addition to any other rights or remedies of the Team with respect thereto, have the rights to (i) cause the Arena Manager to set-off such reimbursement amount against any amount to be paid to the City under this Agreement and to pay such set-off amount to the Team, and (ii) set-off such reimbursement amount against any amount to be paid by the Team to the City under this Agreement.

13.3.7 <u>Optional Remedies of Team</u>. If the City breaches Section 13.3.5, and if the Team seeks and fails to obtain injunctive relief pursuant to Section 13.3.6, then the Team, at its option, shall be entitled to receive payment from the City, as liquidated damages and not as a penalty, in an amount equal to the gross receipts of the City from such Competing Facility or Comparable Event. The parties agree that if the City breaches Section 13.3.5, the aggregate

damages arising from such breach cannot be estimated due to the adverse consequences such a breach will have on the Team, and that the amount described in this Section 13.3.7 constitutes the best, reasonable and objective estimate of the damages that will be incurred by the Team in the event the City breaches Section 13.3.5.

In addition, if the City breaches Section 13.3.5 and if the Team seeks and fails to obtain injunctive relief pursuant to Section 13.3.6, then the Team shall have the right to terminate the Team's duties and obligations under this Agreement (including the Team's obligation to play Home Games at the Arena Facility pursuant to Section 9.5).

      13.3.8 <u>Severability</u>. If and to the extent that a court of competent jurisdiction determines that any provision of Section 13.3.5, 13.3.6 or 13.3.7 is unenforceable, Section 13.3.5, 13.3.6 or 13.3.7, as applicable, shall be interpreted so as to delete or modify the unenforceable provision thereof in such a manner as to make such Section 13.3.5, 13.3.6 or 13.3.7, as so modified, enforceable.

      13.4   <u>Retail/Residential Developer Representations, Warranties and Covenants</u>. The Retail/Residential Developer represents and warrants to, and covenants with, the other parties hereto as follows:

      13.4.1 <u>Organization; Authorization</u>. The Retail/Residential Developer is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; the Retail/Residential Developer has all requisite power and authority to enter into this Agreement; and the execution, delivery and consummation of this Agreement by the Retail/Residential Developer have been duly authorized.

      13.4.2 <u>No Violation</u>. The execution, delivery and performance of this Agreement by the Retail/Residential Developer will not result in the breach of or constitute a default under any loan or credit agreement, or any other agreement, instrument, judgment or decree, to which the Retail/Residential Developer is a party or by which the Retail/Residential Developer or its assets may be bound or affected. All consents and approvals of any Person (including members of the Retail/Residential Developer) required in connection with the Retail/Residential Developer's execution, delivery and performance of this Agreement have been obtained.

      13.4.3 <u>Litigation</u>. Other than as disclosed by the Retail/Residential Developer to the other parties hereto, no suit is pending against the Retail/Residential Developer which could have a material adverse affect upon the Retail/Residential Developer's performance under this Agreement. There are no outstanding judgments against the Retail/Residential Developer which could have a material adverse affect upon the Retail/Residential Developer's performance under this Agreement.

      13.4.4 <u>No Conflicts</u>. This Agreement is not prohibited by, and does not conflict with, any other agreement, judgment or decree to which the Retail/Residential Developer is a party or is otherwise subject.

      13.4.5 <u>No Violation of Laws</u>. As of the Agreement Effective Date, the Retail/Residential Developer has received no notice asserting any noncompliance in any material respect by the Retail/Residential Developer with Applicable Law relating to the transactions

contemplated hereby; and the Retail/Residential Developer is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other Governmental Authority which is in any respect material to the transactions contemplated hereby.

13.5    Entertainment Developer Representations, Warranties and Covenants.    The Entertainment Developer represents and warrants to, and covenants with, the other parties hereto as follows:

13.5.1 Organization; Authorization.   The Entertainment Developer is a limited liability company, duly organized and validly existing under the laws of the State of Delaware; the Entertainment Developer has all requisite power and authority to enter into this Agreement; and the execution, delivery and consummation of this Agreement by the Entertainment Developer have been duly authorized.

13.5.2 No Violation.  The execution, delivery and performance of this Agreement by the Entertainment Developer will not result in the breach of or constitute a default under any loan or credit agreement, or any other agreement, instrument, judgment or decree, to which the Entertainment Developer is a party or by which the Entertainment Developer or its assets may be bound or affected.   All consents and approvals of any Person (including members of the Entertainment Developer) required in connection with the Entertainment Developer's execution, delivery and performance of this Agreement have been obtained.

13.5.3 Litigation.  Other than as disclosed by the Entertainment Developer to the other parties hereto, no suit is pending against the Entertainment Developer which could have a material adverse affect upon the Entertainment Developer's performance under this Agreement. There are no outstanding judgments against the Entertainment Developer which could have a material adverse affect upon the Entertainment Developer's performance under this Agreement.

13.5.4 No Conflicts.  This Agreement is not prohibited by, and does not conflict with, any other agreement, judgment or decree to which the Entertainment Developer is a party or is otherwise subject.

13.5.5 No Violation of Laws.   As of the Agreement Effective Date, the Entertainment Developer has received no notice asserting any noncompliance in any material respect by the Entertainment Developer with Applicable Law relating to the transactions contemplated hereby; and the Entertainment Developer is not in default with respect to any judgment, order, injunction or decree of any court, administrative agency or other Governmental Authority which is in any respect material to the transactions contemplated hereby.

13.6    Mutual Covenants.

13.6.1 Additional Documents and Approval.   Each of the parties hereto, whenever and as often as each shall be reasonably requested to do so by any other party hereto, shall execute or cause to be executed any additional documents, take any additional actions and grant any additional approvals consistent with the provisions of this Agreement as may be necessary or expedient to consummate the transactions provided for in, and to carry out the purpose and intent of, this Agreement.

13.6.2 <u>Challenges</u>. Each of the parties hereto agrees to, in good faith, contest any challenge to the validity, authorization and enforceability of this Agreement (each, a "**Challenge**"), whether asserted by a taxpayer or any other Person. The parties hereto shall strive in good faith to agree jointly upon counsel to defend any such Challenge. If the Challenge occurs before the Operations Start Date, any defense of the Challenge shall be made in the manner provided by Section 16.21 of the Arena Development Agreement. If the Challenge occurs on or after the Operations Start Date, each party hereto shall bear the costs and expenses of contesting the Challenge incurred by such party. Each of the parties hereto shall take all ministerial actions and proceedings necessary or appropriate to remedy any apparent invalidity of, lack or defect in authorization of, or illegality of, or to cure any other defect of, this Agreement which has been asserted or threatened in any Challenge. Each of the parties hereto shall promptly give notice to the other parties hereto of any Challenge of which the party giving notice acquires knowledge.

13.6.3 <u>Notice of Matters</u>. If any of the parties hereto acquires knowledge of any matter which may constitute a breach of any of its representations, warranties or covenants set forth herein which arises after the Agreement Effective Date, it shall promptly give notice of the same to the other parties hereto.

13.6.4 <u>Compliance With Laws</u>. During the Agreement Term, each of the parties hereto shall, in connection with this Agreement and its respective use of, and the exercise of its respective rights with respect to, the Arena, comply with all Applicable Laws.

13.6.5 <u>Survival of Covenants and Warranties</u>. All covenants, representations and warranties contained in this Agreement shall survive the execution and delivery of this Agreement. No action taken pursuant to or related to this Agreement shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, condition or agreement herein.

**ARTICLE 14**

**DEFAULT AND REMEDIES**

14.1     <u>Events of Default</u>.

14.1.1 <u>Event of Default by Arena Manager</u>. Each of the following events shall constitute an "**Event of Default**" by the Arena Manager:

(a)     If the Arena Manager fails, within a reasonable time under the circumstances (including any time required for a reasonable investigation), after the Arena Manager receives notice or otherwise acquires knowledge that any employee, officer, director, independent contractor or agent of the Arena Manager has misappropriated monies or engaged in other fraudulent or illegal activity, to suspend or discharge such  employee, officer, director, independent contractor or agent;

(b)     If the Arena Manager fails to make any payment or distribution to be made by the Arena Manager hereunder at the time and in the manner required by this

Agreement, and such failure is not cured within thirty (30) days after the Arena Manager's receipt of notice of such failure from any other party hereto;

(c) If any representation or warranty made by the Arena Manager in this Agreement at any time proves to have been incorrect in any material respect as of the time made, and if the Arena Manager fails to cause such representation or warranty to become correct within thirty (30) days after the Arena Manager's receipt of notice from any other party hereto that such representation or warranty was incorrect; provided, however, that if it is reasonably possible to cause such representation and/or warranty to become correct but it is not reasonably possible to cause such representation and/or warranty to become correct within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Arena Manager (i) commences to cause such representation and/or warranty to become correct within thirty (30) days after the Arena Manager's receipt of such notice, and (ii) thereafter diligently continues to cause such representation and/or warranty to become correct; or

(d) If the Arena Manager materially breaches any covenant or provision of this Agreement other than as referred to in Section 14.1.1(a), Section 14.1.1(b) or Section 14.1.1(c), and such breach is not cured within thirty (30) days after the Arena Manager's receipt from any other party hereto of notice of such breach; provided, however, that if it is reasonably possible to cure such breach but it is not reasonably possible to cure such breach within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Arena Manager (i) commences to cure such breach within thirty (30) days after the Arena Manager's receipt of such notice, and (ii) thereafter diligently continues to cure such breach.

14.1.2 Event of Default by Team. Each of the following events shall constitute an "**Event of Default**" by the Team:

(a) If the Team fails to pay when due any amount payable by the Team hereunder, and such failure is not cured within thirty (30) days after the Team's receipt of notice of such failure from any other party hereto;

(b) If any representation or warranty made by the Team in this Agreement at any time proves to have been incorrect in any material respect as of the time made, and if the Team fails to cause such representation or warranty to become correct within thirty (30) days after the Team's receipt of notice from any other party hereto that such representation or warranty was incorrect; provided, however, that if it is reasonably possible to cause such representation and/or warranty to become correct but it is not reasonably possible to cause such representation and/or warranty to become correct within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Team (i) commences to cause such representation and/or warranty to become correct within thirty (30) days after the Team's receipt of such notice, and (ii) thereafter diligently continues to cause such representation and/or warranty to become correct;

(c) If the Team becomes insolvent; or admits in writing its inability to pay its debts as they mature; or makes an assignment for the benefit of creditors; or applies for or

consents to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or

(d)     If the Team materially breaches any covenant or provision of this Agreement other than a Team Use Covenant Default or as referred to in Section 14.1.2(a), Section 14.1.2(b) or Section 14.1.2(c), and such breach is not cured within thirty (30) days after the Team's receipt from any other party hereto of notice of such breach; provided, however, that if it is reasonably possible to cure such breach but it is not reasonably possible to cure such breach within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Team (i) commences to cure such breach within thirty (30) days after the Team's receipt of such notice, and (ii) thereafter diligently continues to cure such breach.

14.1.3  Event of Default by City.  Each of the following events shall constitute an **"Event of Default"** by the City:

(a)     If the City fails to pay when due any amount payable by the City hereunder, and such failure is not cured within thirty (30) days after the City's receipt of notice of such failure from any other party hereto;

(b)     If any representation or warranty made by the City herein at any time proves to have been incorrect in any material respect as of the time made, and if the City fails to cause such representation or warranty to become correct within thirty (30) days after the City's receipt of notice from any other party hereto that such representation or warranty was incorrect; provided, however, that if it is reasonably possible to cause such representation and/or warranty to become correct but it is not reasonably possible to cause such representation and/or warranty to become correct within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the City (i) commences to cause such representation and/or warranty to become correct within thirty (30) days after the City's receipt of such notice, and (ii) thereafter diligently continues to cause such representation and/or warranty to become correct;

(c)     If the City becomes insolvent; or admits in writing its inability to pay its debts as they mature; or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or

(d)     If the City materially breaches any covenant or provision of this Agreement other than as referred to in Section 14.1.3(a), Section 14.1.3(b) or Section 14.1.3(c), and such breach is not cured within thirty (30) days after the City's receipt from any other party hereto of notice of such breach; provided, however, that if it is reasonably possible to cure such breach but it is not reasonably possible to cure such breach within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the City (i) commences to cure such breach within thirty (30) days after the City's receipt of such notice, and (ii) thereafter diligently continues to cure such breach.

14.1.4  Event of Default by Retail/Residential Developer.  Each of the following events shall constitute an **"Event of Default"** by the Retail/Residential Developer:

(a)     If the Retail/Residential Developer fails to pay when due any amount payable by the Retail/Residential Developer hereunder, and such failure is not cured within thirty (30) days after the Retail/Residential Developer's receipt of notice of such failure from any other party hereto;

(b)     If any representation or warranty made by the Retail/Residential Developer in this Agreement at any time proves to have been incorrect in any material respect as of the time made, and if the Retail/Residential Developer fails to cause such representation or warranty to become correct within thirty (30) days after the Retail/Residential Developer's receipt of notice from any other party hereto that such representation or warranty was incorrect; provided, however, that if it is reasonably possible to cause such representation and/or warranty to become correct but it is not reasonably possible to cause such representation and/or warranty to become correct within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Retail/Residential Developer (i) commences to cause such representation and/or warranty to become correct within thirty (30) days after the Retail/Residential Developer's receipt of such notice, and (ii) thereafter diligently continues to cause such representation and/or warranty to become correct;

(c)     If the Retail/Residential Developer becomes insolvent; or admits in writing its inability to pay its debts as they mature; or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or

(d)     If the Retail/Residential Developer materially breaches any covenant or provision of this Agreement other than as referred to in Section 14.1.4(a), Section 14.1.4(b) or Section 14.1.4(c), and such breach is not cured within thirty (30) days after the Retail/Residential Developer's receipt from any other party hereto of notice of such breach; provided, however, that if it is reasonably possible to cure such breach but it is not reasonably possible to cure such breach within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Retail/Residential Developer (i) commences to cure such breach within thirty (30) days after the Retail/Residential Developer's receipt of such notice, and (ii) thereafter diligently continues to cure such breach.

14.1.5 Event of Default by Entertainment Developer.  Each of the following events shall constitute an "**Event of Default**" by the Entertainment Developer:

(a)     If the Entertainment Developer fails to pay when due any amount payable by the Entertainment Developer hereunder, and such failure is not cured within thirty (30) days after the Entertainment Developer's receipt of notice of such failure from any other party hereto;

(b)     If any representation or warranty made by the Entertainment Developer in this Agreement at any time proves to have been incorrect in any material respect as of the time made, and if the Entertainment Developer fails to cause such representation or warranty to become correct within thirty (30) days after the Entertainment Developer's receipt of notice from any other party hereto that such representation or warranty was incorrect; provided, however, that if it is reasonably possible to cause such representation and/or warranty to become

correct but it is not reasonably possible to cause such representation and/or warranty to become correct within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Entertainment Developer (i) commences to cause such representation and/or warranty to become correct within thirty (30) days after the Entertainment Developer's receipt of such notice, and (ii) thereafter diligently continues to cause such representation and/or warranty to become correct;

        (c)     If the Entertainment Developer becomes insolvent; or admits in writing its inability to pay its debts as they mature; or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or

        (d)     If the Entertainment Developer materially breaches any covenant or provision of this Agreement other than as referred to in Section 14.1.5(a), Section 14.1.5(b) or Section 14.1.5(c), and such breach is not cured within thirty (30) days after the Entertainment Developer's receipt from any other party hereto of notice of such breach; provided, however, that if it is reasonably possible to cure such breach but it is not reasonably possible to cure such breach within such thirty-day period, then such cure period shall be for an unlimited period of time so long as the Entertainment Developer (i) commences to cure such breach within thirty (30) days after the Entertainment Developer's receipt of such notice, and (ii) thereafter diligently continues to cure such breach.

    14.2    Team Remedies.

    14.2.1  For City Event of Default.  Following an Event of Default by the City, the Team shall have the right to seek compensatory (and, under Section 13.3.7, liquidated), but not consequential or punitive, damages arising out of such Event of Default by the City.  In addition, the Team shall have the right to seek an award and/or order requiring specific performance by the City of the City's obligations under this Agreement.  The Team hereby waives, with respect to any Event of Default by the City, any claim or right to consequential or punitive damages and any right to terminate this Agreement or the rights of the City under this Agreement (other than as expressly stated in this Agreement or in the immediately following paragraph), and acknowledges that the other parties hereto are relying on such waiver in entering into this Agreement.

In the event (i) the Team obtains a final, non-appealable award or judgment for compensatory damages (including liquidated damages pursuant to Section 13.3.7) against the City, and the City fails to pay such judgment within ninety (90) days after the issuance of such award or entry of such judgment, or (ii) the Team obtains a final, non-appealable award or order requiring specific performance by the City of the City's obligations under this Agreement, and the City fails to so perform within ninety (90) days after the date on which the City's performance is required by such award or order, then the Team shall have the right, in addition to any other rights or remedies of the Team, to terminate the Team's duties and obligations under this Agreement (including the Team's obligation to play Home Games at the Arena Facility pursuant to Section 9.5) upon at least ninety (90) days' notice to the other parties hereto.

14.2.2 <u>For Arena Manager Event of Default</u>. Following an Event of Default by the Arena Manager, the Team shall have the right to seek compensatory, but not consequential or punitive, damages arising out of such Event of Default by the Arena Manager. In addition, the Team shall have the right to seek an award and/or order requiring specific performance by the Arena Manager of the Arena Manager's obligations under this Agreement. The Team hereby waives, with respect to any Event of Default by the Arena Manager, any claim or right to consequential or punitive damages and any right to terminate this Agreement or the rights of the Arena Manager under this Agreement, and acknowledges that the other parties hereto are relying on such waiver in entering into this Agreement. The Team further acknowledges that, if at the time the Team's claim arises, the Team and the Arena Manager are controlled by the same Person or the Team controls the Arena Manager (with "control" being defined in Section 15.1.2), the Team may seek damages from the Arena Manager only from the Arena Manager's own funds and shall not have any right to recover damages from the Arena Manager out of Arena Accounts; provided, however, that the Team may recover any underpayment by the Arena Manager to the Team out of Arena Accounts.

14.2.3 <u>For Retail/Residential Developer Event of Default</u>. Following an Event of Default by the Retail/Residential Developer, the Team shall have the right to seek compensatory, but not consequential or punitive, damages arising out of such Event of Default by the Retail/Residential Developer. In addition, the Team shall have the right to seek an award and/or order requiring specific performance by the Retail/Residential Developer of the Retail/Residential Developer's obligations under this Agreement. The Team hereby waives, with respect to any Event of Default by the Retail/Residential Developer, any claim or right to consequential or punitive damages and any right to terminate this Agreement or the rights of the Retail/Residential Developer under this Agreement, and acknowledges that the other parties hereto are relying on such waiver in entering into this Agreement.

14.2.4 <u>For Entertainment Developer Event of Default</u>. Following an Event of Default by the Entertainment Developer, the Team shall have the right to seek compensatory, but not consequential or punitive, damages arising out of such Event of Default by the Entertainment Developer. In addition, the Team shall have the right to seek an award and/or order requiring specific performance by the Entertainment Developer of the Entertainment Developer's obligations under this Agreement. The Team hereby waives, with respect to any Event of Default by the Entertainment Developer, any claim or right to consequential or punitive damages and any right to terminate this Agreement or the rights of the Entertainment Developer under this Agreement, and acknowledges that the other parties hereto are relying on such waiver in entering into this Agreement.

14.3 <u>Arena Manager Remedies</u>.

14.3.1 <u>For Team Event of Default</u>. Following an Event of Default by the Team other than a Team Use Covenant Default (for which the Arena Manager shall have no remedy), the Arena Manager shall have the right to seek compensatory, but not consequential or punitive, damages arising out of such Event of Default by the Team. In addition, the Arena Manager shall have the right to seek an award and/or order requiring specific performance by the Team of the Team's obligations under this Agreement. The Arena Manager hereby waives, with respect to any Event of Default by the Team, any claim or right to consequential or punitive damages and