purposes of A.R.S. §38-511, significantly involved in initiating, negotiating, securing, drafting or creating this Agreement on behalf of the City;

19.12.3 <u>Reliance</u>. The Arena Manager, the Team, the Retail/Residential Developer and the Entertainment Developer shall be entitled to rely on the accuracy of each certification provided by the City pursuant to Section 19.12.2; and

19.12.4 <u>Cancellation</u>. If circumstances arise that could result in the City having the right to cancel this Agreement pursuant to A.R.S. §38-511, the City shall give notice of such circumstances to the other parties hereto, which notice shall describe such circumstances. The City shall not cancel this Agreement pursuant to A.R.S. §38-511 by reason of such circumstances unless and until the following conditions precedent to such cancellation have been satisfied:

(a) each of the Arena Manager, the Team, the Retail/Residential Developer and the Entertainment Developer shall have, within thirty (30) days after their respective receipt of the City notice to which the first sentence of this Section 19.12.4 refers, either (x) presented to the City Manager of the City a statement of the actions that the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) proposes to take with respect to such circumstances and the reasons why the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer (as applicable) asserts that the City should waive its right to cancel this Agreement pursuant to A.R.S. §38-511 by reason of such circumstances, or (y) failed to present such a statement;

(b) within thirty (30) days after the latest expiration of the thirty-day periods described in the immediately preceding clause (a), such City Manager shall have submitted to the City Council of the City a written recommendation whether the City should waive any right to cancel this Agreement pursuant to A.R.S. §38-511 by reason of such circumstances; and

(c) within sixty (60) days after the receipt by the City Council of the City of such written recommendation such City Council shall, after consideration of such recommendation, determine whether to cancel this Agreement pursuant to A.R.S. §38-511 by reason of such circumstances or waive any right to such cancellation.

19.13 <u>Saturday, Sunday or Holiday</u>. If the final date of any period provided for herein for the performance of an obligation or for the taking of any action falls on a day other than a Business Day, then the time of such period shall be deemed extended to the next Business Day.

19.14 <u>Confidentiality of Proprietary Information</u>. The parties hereto acknowledge that certain records and information of or in possession of the Arena Manager, the Team, the Retail/Residential Developer and/or the Entertainment Developer relating to the use, management and/or operation of the Arena (including the terms and conditions of Licenses and Concessions Agreements) that are audited, examined or inspected by the City, the Team, the Retail/Residential Developer and/or the Entertainment Developer pursuant to this Agreement, are or will be proprietary and will place the Arena at a competitive disadvantage if disclosed to competitors and potential users of the Arena. The parties hereto therefore agree that, at all times

during the Agreement Term (as may be extended pursuant to Section 3.2) and subject to Applicable Law, the parties hereto shall take all precautions reasonably necessary to ensure that such proprietary information is not released or disclosed to Persons other than the parties hereto, without the prior consent of the party to which such information pertains. Each of the parties hereto further agrees to notify the other parties hereto upon receipt of a request for disclosure of any such proprietary information so that each party hereto may take appropriate actions to protect such proprietary action.

19.15    City Financing.   The parties hereto each agree to amend or modify this Agreement and the Related Agreements to which they are parties, and to execute and deliver, or cause to be executed and delivered, such additional documents (including usual and customary opinions of their counsel), as may be reasonably necessary to accommodate tax exempt or taxable bond financing to be entered into by the City for the purpose of obtaining proceeds to pay the City Commitment Amount; provided, however, that without the consent of the party affected, no such amendment, modification or additional document shall materially increase the duties and obligations of, or materially decrease the benefits and consideration to be received by, such party. Further, each party hereto agrees to make or consent to such accurate disclosures as are reasonably required in connection with any such bond financing or any offering statement or other document used in connection with such bond financing.

19.16    Attorneys' Fees.   In the event of any controversy, claim or dispute between or among the parties arising from or relating to this Agreement, the prevailing party or parties shall be entitled to recover reasonable costs, expenses and attorneys' fees. For all purposes of this Agreement and any other documents relating to this Agreement, the terms "attorneys' fees" or "counsel fees" shall be deemed to include paralegals and legal assistants' fees, and wherever provision is made herein or therein for the payment of attorneys' or counsel fees or expenses, such provision shall include such fees and expenses (and any applicable sales taxes thereon) incurred in any and all Arbitration, judicial, bankruptcy, reorganization, administrative or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced or after entry of a final judgment.

19.17    Force Majeure.   Failure in performance by any party hereunder shall not be deemed an Event of Default, and the non-occurrence of any condition hereunder shall not give rise to any right otherwise provided herein, when such failure or non-occurrence is due to Force Majeure. An extension of time for the performance by any party hereunder attributable to Force Majeure shall be limited to the period of delay due to such Force Majeure, which period shall be deemed to commence from the time of the commencement of the Force Majeure. Notwithstanding the foregoing, however, no Force Majeure shall discharge the Team's obligation to pay the Base Team Fee or the Additional Team Fee at the time required by this Agreement.

19.18    Agreed Extensions.   Times of performance under this Agreement may also be extended as mutually agreed upon in writing by the parties hereto. However, any failure to agree to a proposed extension of time for performance shall not be deemed grounds for delay or failure to timely cure an Event of Default hereunder.

19.19   <u>Liability Limitation</u>.  Notwithstanding and prevailing over any contrary provision of, or implication in, this Agreement, no member, elected official, official, employee, agent, or consultant of the City, and no direct or indirect equity holder, officer, employee or agent of the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer, shall be liable to any other party hereto, or any successors in interest thereof, in the event of any Event of Default or other breach by the City, the Arena Manager, the Team, the Retail/Residential Developer or the Entertainment Developer, for any amount which may become due to such other party or any successors in interest thereof, or on any other obligation under the terms of this Agreement, except any such obligations which result from their criminal acts with respect hereto (i.e., acts which would constitute crimes were they prosecuted therefor and convicted thereof).  Notwithstanding and prevailing over any contrary provision of, or implication in, this Agreement, no party hereto (the "**Innocent Party**") shall be liable to any other party hereto, or any successor in interest thereto, in the event of any Event of Default or other breach under this Agreement by any party other than the Innocent Party.

19.20   <u>Additional Team Facilities</u>.  In the event that the Team places any ancillary training, practice, office or other facility in the City of Glendale during the Agreement Term, the City shall, to the extent and for the time during the Agreement Term permitted by Applicable Law, abate any taxes levied or imposed by the City on the land and improvements constituting such facility.

19.21   <u>Survival</u>.  All duties and obligations of each party hereto that, by their terms, are to be performed after the Agreement Termination Date shall survive the expiration or other termination of this Agreement.

19.22   <u>Third-Party Beneficiary</u>.  Except with respect to the Arena Developer, which is hereby expressly made a third-party beneficiary of Sections 7.8, 8.2.1 and 8.2.3, the provisions of this Agreement are for the exclusive benefit of the parties hereto and not for the benefit of any third person, and this Agreement shall not be deemed to have conferred any rights, express or implied, upon any third Person other than the Arena Developer.

19.23   <u>Memorandum</u>.  No party hereto shall record this Agreement or a copy thereof. Each party hereto shall, contemporaneously with its execution of this Agreement, execute the Memorandum of Agreement in the form attached hereto as <u>Exhibit "H"</u>, and the parties hereto shall cause such executed Memorandum of Agreement to be recorded in the Official Records of Maricopa County, Arizona within ten (10) days after the delivery of the Arena Facility Land Deed and the Parking Land Deed to the City pursuant to the Arena Development Agreement (with the legal descriptions from such deeds being inserted in <u>Schedule "1"</u> to <u>Exhibit "H"</u> attached hereto).

19.24   <u>Provisions That Are Subject to Other Agreements</u>.  Various provisions in this Agreement indicate that they are subject to the provisions of any one or more of the following agreements:  Licenses, Concessions Agreements, Suite License Agreements, Premium Seat Agreements, Advertising Agreements and Naming Rights Agreements.  The parties hereto agree that no such agreement shall be inconsistent with any provision of this Agreement and that no such agreement shall unreasonably interfere with the Arena Manager's performance of its obligations under this Agreement or with the City's rights under this Agreement.  The parties

further agree that the Team shall, upon request by the City, provide to the City's outside legal counsel for review any proposed form of Concessions Agreement, Suite License Agreement, Premium Seat Agreement, Naming Rights Agreement, or major building or signage sponsorship agreement. The City's outside legal counsel shall have a period of fifteen (15) days after receipt of any such agreement to review it to ensure that it complies with the provisions of this Section 19.24 and to approve or disapprove such agreement. The City's outside legal counsel's failure to approve or disapprove any such agreement within such fifteen-day period shall be conclusively deemed the approval of such agreement. If the City's outside legal counsel disapproves any such agreement within such fifteen-day period, the City and the Team shall negotiate in good faith for a period of up to fifteen (15) days to attempt to resolve the dispute. If they are unable to resolve the dispute within such fifteen-day period, the dispute shall be subject to Arbitration pursuant to Article 16.

19.25 <u>Team's Legal Opinion</u>. The Arena Manager, the Team, the Retail/Residential Developer and the Entertainment Developer hereby agree that the City's obligations to perform under this Agreement and the Related Agreements, including the City's obligation to provide the City Commitment Amount pursuant to the Arena Development Agreement, are conditioned on, and will not become effective until, (a) the Team's execution of this Agreement and the Related Agreements to which the Team is a party does not result in the breach of or constitute a default under any loan or credit agreement or any other agreement, instrument, judgment or decree to which the Team is a party or by which the Team or its assets may be bound or affected, and (b) the City shall have received an opinion of the Team's counsel acceptable to the City to such effect. The provisions of this Section 19.25 are in addition to any other conditions that must be satisfied before the City will be obligated to perform under this Agreement or the Related Agreements.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have hereunto set their hands to be effective as of the Agreement Effective Date.

**ARENA MANAGER**:

ARENA MANAGEMENT GROUP, LLC,
a Delaware limited liability company

By:    Arena Management Services, Inc.,
an Arizona corporation,
its manager

    By:
    Name:   *Steven M. Ellman*
    Its:   *Chairman & C.E.0.*

**TEAM**:

COYOTES HOCKEY, LLC,
a Delaware limited liability company

By:    Arizona Hockey Management, Inc.,
an Arizona corporation,
its manager

    By:
    Name:   *Steven M. Ellman*
    Its:   *Chairman & C.E.0.*

**RETAIL/RESIDENTIAL DEVELOPER**:

GLENDALE-101 DEVELOPMENT, LLC,
a Delaware limited liability company

By:    E224 Holdings, Inc.,
an Arizona corporation,
its manager

    By:
    Name:   *Steven M. Ellman*
    Its:   *Chairman & C.E.0.*

**ENTERTAINMENT DEVELOPER**:

COYOTE CENTER DEVELOPMENT, LLC,
a Delaware limited liability company

By:      Center Ice Development, Inc.,
         an Arizona corporation,
         its manager

By: _____
Name: _Steven M. Ellman_
Its: _Chairman & C.E.O._

**CITY**:

ATTEST:

_____
City Clerk

**CITY OF GLENDALE**,
an Arizona municipal corporation

By: _____
Name: _ED BEASLEY_
Its: _ASST. CITY MANAGER_

APPROVED AS TO FORM:

_____
City Attorney

# EXHIBIT "A" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Pro Forma Financial Information

### (See Recital N)

### (Attached)

**Pro Forma Financial Information**

| Fiscal Year | Gross Arena Sales Tax Revenue | Gross Parking Revenue | Base Recovery Fee (1) | Gross Retail Development Taxes | Transit Tax (.5%) | Public Safety Tax (.1%) | Total | Fiscal Year |
|---|---|---|---|---|---|---|---|---|
| 2003-04 | $1,579,025 | $3,426,751 | | $4,546,798 | $2,684,373 | $536,875 | $12,773,821 | 2003-04 |
| 2004-05 | 1,600,068 | 3,496,684 | | 5,250,299 | 2,635,290 | 527,058 | 13,509,400 | 2004-05 |
| 2005-06 | 1,621,639 | 3,566,618 | | 7,977,825 | 3,720,087 | 744,017 | 17,630,188 | 2005-06 |
| 2006-07 | 1,643,752 | 3,636,552 | | 8,622,557 | 3,995,563 | 799,113 | 18,697,537 | 2006-07 |
| 2007-08 | 1,666,418 | 3,706,486 | | 11,499,632 | 5,356,047 | 1,071,209 | 23,299,793 | 2007-08 |
| 2008-09 | 1,689,654 | 3,776,419 | | 11,199,990 | 5,066,713 | 1,013,343 | 22,746,119 | 2008-09 |
| 2009-10 | 1,713,472 | 3,846,353 | | 11,593,667 | 4,844,851 | 968,970 | 22,967,313 | 2009-10 |
| 2010-11 | 1,737,887 | 3,916,287 | | 11,709,604 | 4,898,469 | 979,694 | 23,241,940 | 2010-11 |
| 2011-12 | 1,762,915 | 3,986,220 | | 11,826,700 | 4,952,776 | 990,555 | 23,519,167 | 2011-12 |
| 2012-13 | 1,788,571 | 4,056,154 | | 11,944,967 | 5,007,784 | 1,001,557 | 23,799,032 | 2012-13 |
| 2013-14 | 1,814,870 | 4,126,088 | | 12,064,417 | 5,063,502 | 1,012,700 | 24,081,577 | 2013-14 |
| 2014-15 | 1,841,829 | 4,196,021 | | 12,185,061 | 5,119,944 | 1,023,989 | 24,366,844 | 2014-15 |
| 2015-16 | 1,869,464 | 4,265,955 | | 12,306,912 | 5,177,119 | 1,035,424 | 24,654,874 | 2015-16 |
| 2016-17 | 1,897,793 | 4,335,889 | $2,797,348 | 12,429,981 | 5,235,040 | 1,047,008 | 27,743,057 | 2016-17 |
| 2017-18 | 1,926,832 | 4,405,822 | 2,797,348 | 12,554,281 | 5,293,718 | 1,058,744 | 28,036,743 | 2017-18 |
| 2018-19 | 1,956,599 | 4,475,756 | 2,797,348 | 12,679,823 | 5,353,165 | 1,070,633 | 28,333,324 | 2018-19 |
| 2019-20 | 1,987,113 | 4,545,690 | 2,797,348 | 12,806,622 | 5,413,394 | 1,082,679 | 28,632,845 | 2019-20 |
| 2020-21 | 2,018,393 | 4,615,623 | 2,797,348 | 12,934,688 | 5,474,417 | 1,094,883 | 28,935,352 | 2020-21 |
| 2021-22 | 2,050,458 | 4,685,557 | 2,797,348 | 13,064,035 | 5,536,247 | 1,107,249 | 29,240,893 | 2021-22 |
| 2022-23 | 2,083,327 | 4,755,491 | 2,797,348 | 13,194,675 | 5,598,896 | 1,119,779 | 29,549,515 | 2022-23 |
| 2023-24 | 2,729,520 | 4,825,425 | 2,797,348 | 13,326,622 | 5,662,379 | 1,132,476 | 30,473,769 | 2023-24 |
| 2024-25 | 2,734,059 | 4,895,358 | 2,797,348 | 13,459,888 | 5,714,208 | 1,142,842 | 30,743,703 | 2024-25 |
| 2025-26 | 2,769,464 | 4,965,292 | 2,797,348 | 13,594,487 | 5,779,398 | 1,155,880 | 31,061,869 | 2025-26 |
| 2026-27 | 2,805,758 | 5,035,226 | 2,797,348 | 13,730,432 | 5,845,463 | 1,169,093 | 31,383,318 | 2026-27 |
| 2027-28 | 2,842,962 | 5,105,159 | 2,797,348 | 13,867,736 | 5,912,416 | 1,182,483 | 31,708,104 | 2027-28 |
| 2028-29 | 2,881,100 | 5,175,093 | 2,797,348 | 14,006,413 | 5,980,273 | 1,196,055 | 32,036,281 | 2028-29 |
| 2029-30 | 2,920,195 | 5,245,027 | 2,797,348 | 14,146,478 | 6,049,048 | 1,209,810 | 32,367,904 | 2029-30 |
| 2030-31 | 2,960,270 | 5,314,960 | 2,797,348 | 14,287,942 | 6,118,756 | 1,223,751 | 32,703,028 | 2030-31 |
| 2031-32 | 3,001,351 | 5,384,894 | 2,797,348 | 14,430,822 | 6,189,414 | 1,237,883 | 33,041,711 | 2031-32 |
| 2032-33 | 3,043,463 | 5,454,828 | 2,797,348 | 14,575,130 | 6,261,037 | 1,252,207 | 33,384,012 | 2032-33 |
| Total | $64,938,220 | $133,223,678 | $47,554,909 | $361,818,483 | $155,939,786 | $31,187,957 | $794,663,034 | Totals |

A-2

# EXHIBIT "B" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Game Payment

## (See Section 1.1)

| Hockey Season | Per Game Operating Expense Reimbursement |
|---|---|
| 2001-2002 | $ 25,000 |
| 2002-2003 | $ 25,750 |
| 2003-2004 | $ 26,523 |
| 2004-2005 | $ 27,318 |
| 2005-2006 | $ 28,138 |
| 2006-2007 | $ 28,982 |
| 2007-2008 | $ 29,851 |
| 2008-2009 | $ 30,747 |
| 2009-2010 | $ 31,669 |
| 2010-2011 | $ 32,619 |
| 2011-2012 | $ 33,598 |
| 2012-2013 | $ 34,606 |
| 2013-2014 | $ 35,644 |
| 2014-2015 | $ 36,713 |
| 2015-2016 | $ 37,815 |
| 2016-2017 | $ 38,949 |
| 2017-2018 | $ 40,118 |
| 2018-2019 | $ 41,321 |
| 2019-2020 | $ 42,561 |
| 2020-2021 | $ 43,838 |
| 2021-2022 | $ 45,153 |
| 2022-2023 | $ 46,507 |
| 2023-2024 | $ 47,903 |
| 2024-2025 | $ 49,340 |
| 2025-2026 | $ 50,820 |
| 2026-2027 | $ 52,344 |
| 2027-2028 | $ 53,915 |
| 2028-2029 | $ 55,532 |
| 2029-2030 | $ 57,198 |
| 2030-2031 | $ 58,914 |
| 2031-2032 | $ 60,682 |
| 2032-2033 | $ 62,502 |
| 2033-2034 | $ 64,377 |
| 2034-2035 | $ 66,308 |
| 2035-2036 | $ 68,298 |
| 2036-2037 | $ 70,347 |
| 2037-2038 | $ 72,457 |
| 2038-2039 | $ 74,631 |
| 2039-2040 | $ 76,870 |

| | |
|---|---|
| 2040-2041 | $ 79,176 |
| 2041-2042 | $ 81,551 |
| 2042-2043 | $ 83,997 |
| 2043-2044 | $ 86,517 |
| 2044-2045 | $ 89,113 |
| 2045-2046 | $ 91,786 |

# EXHIBIT "C" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Scheduling Procedures

## (See Section 1.1)

To be attached as and when provided in Section 1.1.

# EXHIBIT "D" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Insurance Required of Arena Manager

## (See Section 10.1)

**Definitions.** Capitalized terms that are used but not otherwise defined in this <u>Exhibit "D"</u> (this "**Exhibit**") shall have the meanings set forth in Section 1.1 of the Arena Management, Use and Lease Agreement (the "**Arena Management Agreement**") to which this Exhibit is attached.

1.  The Arena Manager shall maintain the following insurance coverages during the Agreement Term, or for such additional time as required in any section below:

    - Statutory Workers' Compensation
    - Commercial General Liability (including Liquor Liability)
    - Commercial Automobile Liability
    - Excess Liability
    - All Risk Property and Boiler & Machinery.

    The above coverages shall comply with the following:

    a.  <u>Statutory Workers' Compensation</u>: The Arena Manager shall maintain statutory workers' compensation insurance to cover obligations imposed by federal and state statutes having jurisdiction over all employees of the Arena Manager engaged in the performance of work relating to management of the Arena.

    b.  <u>Commercial General Liability</u>: The Arena Manager shall maintain commercial general liability insurance covering all operations by or on behalf of the Arena Manager on an occurrence basis insuring against bodily injury, broad form property damage (including completed operations), personal injury (including coverage for contractual and employee acts), blanket contractual, products and completed operations. Further, the policy shall include coverage for liquor liability and the hazards commonly referred to as XCU (explosion, collapse, and underground). The policy shall contain severability of interest provisions and shall be at least as broad as Insurance Service Office (ISO) form 1986. The limits of commercial general liability insurance required of the Arena Manager shall be no less than the following:

        $1,000,000 bodily injury and property damage each occurrence
        $2,000,000 general aggregate (annual)
        $2,000,000 products / completed operations aggregate, and
        $1,000,000 personal and advertising injury.

        In the event the commercial general liability insurance policy is written on a "claims-made" basis, the retroactive date shall be no later than the Agreement Effective Date. Coverage shall extend for at least five (5) years after termination of the Arena Management Agreement and shall be evidenced by annual certificates of insurance.

c. Commercial Automobile Liability: The Arena Manager shall maintain commercial automobile liability insurance with respect to all vehicles used in the performance of work at the Arena and away from the Arena, whether owned, non-owned, borrowed, leased or hired, with limits no less than the following:

$1,000,000 combined single limit for bodily injury and property damage.

If hazardous materials or waste are to be transported, the commercial automobile liability insurance shall be endorsed with the MCS-90 endorsement in accordance with Applicable Law.

d. Excess Liability: The Arena Manager shall maintain excess liability insurance on an occurrence basis, insuring against bodily injury, personal injury, and property damage, and all other coverages as specified in Sections 1.b (commercial general liability) and 1.c (automobile liability) of this Exhibit over and above the limits required for each such coverage. The limits of excess liability insurance shall be no less than the following:

$25,000,000 each occurrence
$25,000,000 annual aggregate
$25,000,000 products / completed operations (annual).

Total per occurrence limits of $25,000,000 may be satisfied in any combination of primary and excess policies of insurance. Any applicable retention shall be the sole responsibility of the Arena Manager.

e. All Risk Property: The Arena Manager shall maintain all risk property and boiler & machinery insurance to insure against physical loss or damage to the Arena (including any personal property owned by the City and used in connection with the Arena) and all personal property of the Arena Manager while at the Arena. Such coverage shall be written on a replacement cost basis, include flood and earthquake coverage, and shall not be subject to co-insurance.

2. The Arena Manager shall cause all tenants and concessionaires, other than the Team, to acquire and maintain, during the full term of each such tenant's or concessionaire's contractual relationship, all insurance coverages required of the Team as set forth in Exhibit "F" to the Arena Management Agreement. Certificates of insurance evidencing the required coverages, conditions and limits are in full force and effect shall be provided by each such tenant or concessionaire to the Arena Manager.

# EXHIBIT "E" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Insurance Required of City

## (See Section 10.2)

Definitions. Capitalized terms that are used but not otherwise defined in this Exhibit "E" (this "**Exhibit**") shall have the meanings set forth in Section 1.1 of the Arena Management, Use and Lease Agreement (the "**Arena Management Agreement**") to which this Exhibit is attached.

1.  The City shall maintain the following insurance coverages during the Agreement Term, or for such additional time as required in any section below.

- Statutory Workers' Compensation
- Commercial General Liability (including Liquor Liability)
- Commercial Automobile Liability
- Excess Liability

The above coverages shall comply with the following:

a.  <u>Statutory Workers' Compensation</u>:   The City shall maintain statutory workers' compensation insurance to cover obligations imposed by federal and state statutes having jurisdiction over all employees of the City engaged in the performance of work relating to the Arena.

b.  <u>Commercial General Liability</u>: The City shall maintain commercial general liability insurance covering all operations by or on behalf of the City on an occurrence basis insuring against bodily injury, broad form property damage (including completed operations), personal injury (including coverage for contractual and employee acts), blanket contractual, products and completed operations.  Further, the policy shall include coverage for liquor liability and the hazards commonly referred to as XCU (explosion, collapse, and underground). The policy shall contain severability of interest provisions and shall be at least as broad as Insurance Service Office (ISO) form 1986. The limits of liability insurance required of the City shall be no less than the following:

> $1,000,000 bodily injury and property damage each occurrence
> $2,000,000 general aggregate (annual)
> $2,000,000 products / completed operations aggregate, and
> $1,000,000 personal and advertising injury.

In the event the commercial general liability insurance policy is written on a "claims-made" basis, the retroactive date shall be no later than the Agreement Effective Date. Coverage shall extend for at least five (5) years after termination of the Arena Management Agreement and shall be evidenced by annual certificates of insurance.

c.  Commercial Automobile Liability: The City shall maintain commercial automobile liability insurance with respect to all vehicles used in the performance of work at the Arena and away from the Arena, whether owned, non-owned, borrowed, leased or hired, with limits no less than the following:

$1,000,000 combined single limit for bodily injury and property damage.

If hazardous materials or waste are to be transported, the commercial automobile liability insurance shall be endorsed with the MCS-90 endorsement in accordance with Applicable Law.

d.  Self Insurance: The City may satisfy its requirements under Sections 1.a, 1.b and 1.c above through its established program of self insurance, as authorized by its City Council. The City shall provide all other parties with a certificate of self insurance for the required amounts.

# EXHIBIT "F" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Insurance Required of Team

### (See Section 10.3)

<u>Definitions</u>.  Capitalized terms that are used but not otherwise defined in this <u>Exhibit "F"</u> (this "**Exhibit**") shall have the meanings set forth in Section 1.1 of the Arena Management, Use and Lease Agreement (the "**Arena Management Agreement**") to which this Exhibit is attached.

1.     The Team shall maintain the following insurance coverages during the Agreement Term, or for such additional time as required in any section below.

- Statutory Workers' Compensation
- Commercial General Liability (including Liquor Liability)
- Commercial Automobile Liability
- Excess Liability
- All Risk Property.

The above coverages shall comply with the following:

a.     <u>Statutory Workers' Compensation</u>:    The Team shall maintain statutory workers' compensation insurance to cover obligations imposed by federal and state statutes having jurisdiction over all employees of the Team engaged in the performance of work relating to the Team.

b.     <u>Commercial General Liability</u>: The Team shall maintain commercial general liability insurance covering all operations by or on behalf of the Team on an occurrence basis insuring against bodily injury, broad form property damage (including completed operations), personal injury (including coverage for contractual and employee acts), blanket contractual, products and completed operations.  Further, the policy shall include coverage for liquor liability and the hazards commonly referred to as XCU (explosion, collapse, and underground). The policy shall contain severability of interest provisions and shall be at least as broad as Insurance Service Office (ISO) form 1986. The limits of commercial general liability insurance required of the Team shall be no less than the following:

    $1,000,000 bodily injury and property damage each occurrence
    $2,000,000 general aggregate (annual)
    $2,000,000 products / completed operations aggregate, and
    $1,000,000 personal and advertising injury.

In the event the commercial general liability insurance policy is written on a "claims-made" basis, the retroactive date shall be no later than the Agreement Effective Date. Coverage shall extend for at least five (5) years after termination of the Arena Management Agreement and shall be evidenced by annual certificates of insurance.

c.   Commercial Automobile Liability: The Team shall maintain commercial automobile liability insurance with respect to all vehicles used in the performance of work at the Arena and away from the Arena, whether owned, non-owned, borrowed, leased or hired, with limits no less than the following:

$1,000,000 combined single limit for bodily injury and property damage.

If hazardous materials or waste are to be transported, the commercial automobile liability insurance shall be endorsed with the MCS-90 endorsement in accordance with Applicable Law.

d.   Excess Liability: The Team shall maintain excess liability insurance on an occurrence basis, insuring against bodily injury, personal injury, and property damage, and all other coverages as specified in Sections 1.b (commercial general liability) and 1.c (automobile liability) of this Exhibit over and above the limits required for each such coverage. The limits of excess liability insurance shall be no less than the following:

$10,000,000 each occurrence
$10,000,000 annual aggregate
$10,000,000 products / completed operations (annual).

Total per occurrence limits of $10,000,000 may be satisfied in any combination of primary and excess policies of insurance. Any applicable retention shall be the sole responsibility of the Team.

e.   All Risk Property: The Team shall maintain all risk property insurance to insure against physical loss or damage to all personal property of the Team while at the Arena. Such coverage will be written on a replacement cost basis, include flood and earthquake coverage and shall not be subject to co-insurance.

# EXHIBIT "G" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Initial Arbitrator List

### (See Article 16)

1.     Brad Mayne
   American Airlines Center
   Dallas, Texas

2.     Rich Krezwick
   Fleet Center
   Boston, Massachusetts

3.     Bob Williams
   Phillips Arena
   Atlanta, Georgia

4.     Steve Zito
   SBC Center
   San Antonio, Texas

5.     Lee Ziedman
   Staples Center
   Los Angeles, California

# EXHIBIT "H" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Memorandum of Agreement

## (See Section 19.23)

When Recorded, Return To:
Coyotes Hockey, LLC
4040 East Camelback Road, Suite 250
Phoenix, Arizona 85018
Attention: Robert P. Kaufman

## MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this **"Memorandum"**) is made as of
_____, 200_, by and among the City of Glendale, an Arizona municipal
corporation (the **"City"**); Arena Management Group, LLC, a Delaware limited liability
company (the **"Arena Manager"**); Coyotes Hockey, LLC, a Delaware limited liability
company (the **"Team"**); Glendale-101 Development, LLC, a Delaware limited liability
company (the **"Retail/Residential Developer"**); and Coyote Center Development, LLC,
a Delaware limited liability company (the **"Entertainment Developer"**).

Notice is hereby given that the City, the Arena Manager, the Team, the
Retail/Residential Developer and the Entertainment Developer have entered into that
certain Arena Management, Use and Lease Agreement dated as of November 29, 2001 (the
**"Arena Management Agreement"**) with respect to that certain real property more
particularly described on Schedule "1" attached hereto. Capitalized terms that are used but
not otherwise defined in this Memorandum shall have the meanings set forth in Section
1.1 of the Arena Management Agreement.

The Arena Management Agreement has an Agreement Term of approximately thirty
(30) years, and grants to the Team the right to extend the Agreement Term for one (1)
period of two (2) years and for two (2) additional periods of five (5) years each.

The purpose of this Memorandum is to give record notice of the Arena Management
Agreement to third parties. The Arena Management Agreement contains and sets forth
other important terms and provisions which are incorporated herein by reference, including,
without limitation, provisions pertaining to the leasehold interest of the Team in certain
portions of such real property. This Memorandum shall not limit, expand, supplement or
modify the Arena Management Agreement, and in the event of any conflict between the
terms of this Memorandum and the Arena Management Agreement, the Arena
Management Agreement shall, in all instances, control.

IN WITNESS WHEREOF, the parties have hereunto set their hands to be effective as of the Agreement Effective Date.

**ARENA MANAGER**:

ARENA MANAGEMENT GROUP, LLC,
a Delaware limited liability company

By:    Arena Management Services, Inc.,
an Arizona corporation,
its manager

By:    _____
Name:  _____
Its:    _____

**TEAM:**

COYOTES HOCKEY, LLC,
a Delaware limited liability company

By:    Arizona Hockey Management, Inc.,
an Arizona corporation,
its manager

By:    _____
Name:  _____
Its:    _____

**RETAIL/RESIDENTIAL DEVELOPER**:

GLENDALE-101 DEVELOPMENT, LLC,
a Delaware limited liability company

By:    E224 Holdings, Inc.,
an Arizona corporation,
its manager

By:    _____
Name:  _____
Its:    _____

**ENTERTAINMENT DEVELOPER**:

COYOTE CENTER DEVELOPMENT, LLC,
a Delaware limited liability company

By:    Center Ice Development, Inc.,
       an Arizona corporation,
       its manager

       By:    _____
       Name:  _____
       Its:    _____

**CITY**:

ATTEST:          **CITY OF GLENDALE**,
                  an Arizona municipal corporation

_____    By:  _____
    City Clerk          Name: _____
                       Its:  _____

APPROVED AS TO FORM:

_____
    City Attorney

STATE OF ARIZONA         )
                                 ) ss.
County of Maricopa        )

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, the _____ of Arena Management Services, Inc., an Arizona corporation, the manager of Arena Management Group, LLC, a Delaware limited liability company, on behalf of the limited liability company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                         _____
                                       Notary Public

My commission expires:

_____


STATE OF ARIZONA         )
                                 ) ss.
County of Maricopa        )

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, the _____ of Arizona Hockey Management, Inc., an Arizona corporation, the manager of Coyotes Hockey, LLC, a Delaware limited liability company, on behalf of the limited liability company.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                         _____
                                       Notary Public

My commission expires:

_____

STATE OF ARIZONA                )
                                ) ss.
County of Maricopa              )

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, the _____ of E224 Holdings, Inc., an Arizona corporation, the manager of Glendale-101 Development, LLC, a Delaware limited liability company, on behalf of the limited liability company.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                    _____
                                    Notary Public

My commission expires:

_____


STATE OF ARIZONA                )
                                ) ss.
County of Maricopa              )

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by _____, the _____ of Center Ice Development, Inc., an Arizona corporation, the manager of Coyote Center Development, LLC, a Delaware limited liability company, on behalf of the limited liability company.


IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                    _____
                                    Notary Public

My commission expires:

_____

STATE OF ARIZONA )
                    ) ss.
County of Maricopa )

The foregoing instrument was acknowledged before me this _____ day of _____, 200_, by
_____, the _____of the City of Glendale, an Arizona municipal
corporation, on behalf of the City.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
        Notary Public

My commission expires:

_____

# EXHIBIT "I" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Renewal and Replacement Schedule

### (See Section 1.1)

To be attached as and when provided in Section 1.1.

# EXHIBIT "J" TO ARENA MANAGEMENT, USE AND LEASE AGREEMENT

## Safety and Security Agreement

### (See Section 1.1)

## SAFETY AND SECURITY AGREEMENT

This Safety and Security Agreement (this "Agreement") is dated as of November 29, 2001 (the "Agreement Effective Date"), by and among the City of Glendale, an Arizona municipal corporation (the "City"); Arena Management Group, LLC, a Delaware limited liability company (the "Arena Manager"); and Coyotes Hockey, LLC, a Delaware limited liability company (the "Team"). Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings ascribed to them in the Arena Management Agreement (defined below).

## RECITALS

A. The City, the Arena Manager and the Team are parties to that certain Arena Management, Use and Lease Agreement dated as of the Agreement Effective Date (the "Arena Management Agreement"), which provides for the management and use of the Arena.

B. The City, the Arena Manager, and the Team desire to enter into this Agreement for the purposes of providing for the safety and security of visitors and patrons to the Arena and traffic control in and around the Arena during Events through the use of the services of Police Officers, Police Assistants and Paramedics (each as hereinafter defined and, collectively, the "City Safety Personnel").

C. During Events, the City is willing to provide the services of City Safety Personnel on the terms and conditions set forth herein in order to enhance the City's ability to coordinate the supervision of all City Safety Personnel assigned in and around the Arena and to respond to incidents requiring the response of City Safety Personnel.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, covenants, agreements, and obligations contained herein, the parties hereto enter into this Agreement and agree as follows:

1. **Term and Termination**

This Agreement shall commence on the Operations Start Date and shall continue through the Agreement Term. Each party may terminate this Agreement at its convenience, without cause, upon thirty (30) days prior written notice to the other parties hereto. In the event this Agreement is terminated by any party hereto at its convenience, the Arena Manager will be entitled to receive from the City a pro rata refund of the Annual Fee (for the Fiscal Year during which such termination occurs) paid by the Arena Manager pursuant to Section 6.1 of this Agreement, based on the number of days then remaining in such Fiscal Year.

2. **Scope of Services-Traffic Control**

2.1.     The City, through its Police Department, will assign an on-duty Sergeant to supervise and coordinate traffic control services for each Event.  The City, through its Police Department and Street Transportation Department, also will assign on-duty police officers ("Police Officers") and on-duty civilian police assistants ("Police Assistants") to provide traffic control at Events.  The number of Police Officers and Police Assistants assigned to an Event and the intersections at which the Police Officers and Police Assistants will be posted will be as prescribed by the Street Transportation Department's traffic and barricade plan for the Arena (the "Traffic Control Plan").  The Police Officers and Police Assistants working the traffic control detail at an Event will be responsible for erecting barricades as designated on the Traffic Control Plan.  The Police Assistants will work traffic control under the direction of the Police Officers assigned to such work.

2.2     The Team (with respect to Hockey Events) and the Arena Manager may request permanent amendments to the Traffic Control Plan by submitting a written proposal to the City of Glendale Police Chief and Street Transportation Department Director, who may approve or deny the proposal in their sole discretion.  Any temporary changes to the Traffic Control Plan, based on unique events or circumstances, must be jointly approved by an authorized representative of the City's Police Department (the "Police Representative"), the Team (with respect to a Hockey Event) and the Arena Manager.  Notwithstanding the foregoing, the on-duty Sergeant assigned to traffic control under the Traffic Control Plan may make immediate changes in the Traffic Control Plan at the time of an event if, in his or her discretion, traffic conditions or other tactical needs warrant such changes.

3. **Scope of Services-Internal and External Security at Arena**

The number of Police Officers assigned to provide security, including but not limited to liquor control, in the Arena Facility and in the areas immediately surrounding the Arena Facility during Events will be jointly determined on an Event-by-Event basis by the Police Representative, the Arena Manager and the Team (with respect to Hockey Events).  Nothing herein shall preclude the Arena Manager from employing or engaging personnel ("Private Security Personnel") to provide services at the Arena in cooperation with the City Safety Personnel.

4. **Scope of Services-Medical Attention**

The City, through its Fire Department, will assign on-duty emergency services personnel ("Paramedics") to provide emergency medical services to persons in the Arena Facility and in the areas immediately surrounding the Arena Facility during Events.  The number of Paramedics assigned will be jointly determined on an Event-by-Event basis by an authorized representative of the City's Fire Department, the Arena Manager and the Team (with respect to Hockey Events).

5. **Assignment of City Safety Personnel**

The City will select the City Safety Personnel assigned to perform services for Events pursuant to this Agreement.  The Arena Manager and the Team, however, will each have

the right, which shall be exercised reasonably and in compliance with Section 19.9 of the Arena Management Agreement, to require the City to remove and replace City Safety Personnel. Except as provided in Section 7.1(b) of this Agreement, the City, at its expense, will provide the City Safety Personnel with vehicles, radios and other equipment necessary for their duties.

6. **Payment**

6.1    In consideration for the services to be provided by the City under this Agreement, the Arena Manager will pay the City, on or before the first day of each Fiscal Year, an annual fee (the "Annual Fee") (i) in the amount of Sixty Thousand Dollars ($60,000) for the Fiscal Year during which the Operations Start Date occurs and Sixty Thousand Dollars ($60,000) for the first full Fiscal Year after the Fiscal Year during which the Operations Start Date occurs, and (ii) for each Fiscal Year thereafter, in an amount determined by multiplying the amount of the Annual Fee for the immediately preceding Fiscal Year by 1.03. The Annual Fee for the Fiscal Year during which the Operations Start Date occurs shall be prorated based on the number of days then remaining in such Fiscal Year on and after the Operations Start Date. The Annual Fee shall be paid by the Arena Manager as an Operating Expense under the Arena Management Agreement.

6.2    As additional consideration for such services, the Arena Manager will pay the City the base hourly rates (i.e., regular hourly rates, not overtime rates), plus the City's share of any employment, FICA, or similar taxes related thereto, (collectively, the "Hourly Fee", and together with the Annual Fee, the "Safety Fee") of the City Safety Personnel for all work performed by City Safety Personnel for Events (in excess of work normally performed by City Safety Personnel when Events are not being conducted) pursuant to this Agreement, which shall not include time for travel to and from the Arena. The City will charge the Arena Manager, and the Arena Manager will pay, the Hourly Fee for a minimum of three (3) hours for each such City Safety Personnel working at each Event. Except as otherwise provided herein, the City will invoice the Arena Manager monthly for all amounts owing from the previous month, showing the actual hours worked by City Safety Personnel at each Event held during the previous month. At the request of the Arena Manager, however, the City will submit an invoice to the Arena Manager at the time of an Event when the Arena Manager requires such invoice to pass the cost of such services on to Licensees or other users of the Arena. The Arena Manager will make payment to the City within thirty (30) days of the receipt of an invoice. The Hourly Fee shall be paid by the Arena Manager as an Operating Expense under the Arena Management Agreement.

7. **Responsibilities of the Arena Manager**

7.1    The Arena Manager will provide:

(a)    A schedule of Events to the Police Representative promptly upon the preparation thereof and will promptly notify the Police Representative in writing of any changes thereto.

(b)    A barricade truck and trailer and the barricades necessary to implement the Traffic Control Plan in the immediate vicinity of the Arena.

7.2     The Arena Manager will be solely responsible for obtaining any reimbursement from a Licensee or other user of the Arena for any of such Licensee's or other user's agreed share of the Safety Fee, which shall in no way affect the obligations of the Arena Manager to pay the Safety Fee to the City pursuant to the terms and conditions set forth herein.

8.      **Employment and Organizational Disclaimer**

This Agreement is not intended to and will not constitute, create, give rise to or otherwise recognize a joint venture, partnership or formal business association or organization of any kind between the parties hereto, and the rights and obligations of the parties hereto shall be only those expressly set forth in this Agreement.

No City Safety Personnel or other person supplied by the City pursuant to this Agreement shall be deemed an employee of the Arena Manager or the Team, and the Arena Manager and the Team shall have no obligations with respect to the City's civil service, retirement or personnel rules applicable to such City Safety Personnel. Except with respect to the Arena Manager's obligation to pay the Hourly Fee to the City to reimburse the City for certain of its costs, the City shall have total responsibility for all salaries, wages, bonuses, retirement benefits, tax withholding, workers' compensation benefits, occupational disease compensation, unemployment compensation, other employee benefits and taxes and premiums appurtenant thereto with respect to the City Safety Personnel, and the City shall save and hold the Arena Manager and the Team harmless with respect thereto.

No Private Security Personnel or other person employed or engaged by the Arena Manager shall be deemed an employee of the City or the Team, and the City and the Team shall have no obligations with respect to the Arena Manager's personnel rules applicable to Private Security Personnel. The Arena Manager shall have total responsibility for all salaries, wages, bonuses, retirement benefits, tax withholding, workers' compensation benefits, occupational disease compensation, unemployment compensation, other employee benefits, and taxes and premiums appurtenant thereto with respect to the Private Security Personnel, and the Arena Manager shall save and hold the City and the Team harmless with respect thereto; provided, however, that this paragraph is not intended to create or recognize any liability of the Arena Manager to any employee or independent contractor of any third party.

9.      **Indemnification**

Each party to this Agreement, as an indemnitor, shall have and hold harmless each of the other parties to this Agreement, as an indemnitee, and its officials, officers, agents, servants, and employees, from any and all claims, demands, suits, actions, proceedings, losses, costs and damages of every kind, including, but not limited to attorneys' fees, which may be made or brought against the indemnitee party on account of any loss or damage to property of or for injury to or death of any person, to the extent that said loss, damage, injury or death is the result of any error or omission or negligent act of the indemnitor party, its officials, officers, agents, servants, employees, or any representatives for which the indemnitor party is legally liable (provided that the City (and not the Team or the Arena Manager) shall be legally liable for the City Safety Personnel and the Arena Manager (and not the Team or the City) shall be legally liable for the Private Security Personnel), arising out of or incidental to the performance of this

Agreement (including the performance of any City Safety Personnel or Private Security Personnel duties in connection herewith) except for occurrences for which the indemnitee has sole responsibility.

10. **Conflicts of Interest**

The Arena Manager understands and acknowledges that this Agreement is subject to cancellation without penalty or further obligation by the City pursuant to the provisions of section 38-511, Arizona Revised Statutes.

11. **Notices**

Except as otherwise expressly provided in this Agreement, all notices, demands, disclosures, acknowledgments, consents, approvals, statements, requests, responses and invoices to be given under this Agreement shall be in writing, signed by the party or officer, agent or attorney of the party giving such notice, demand, disclosure, acknowledgment, consent, approval, statement, request, response and/or invoice, and shall be deemed effective (i) upon receipt if hand delivered or sent by telecopy or overnight courier service; or (ii) upon delivery or the date of refusal if sent by the United States mail, postage prepaid, certified mail, return receipt requested, in either case addressed as follows:

To the Arena Manager:  Steven Ellman
Arena Management Group, LLC
4040 East Camelback Road, Suite 250
Phoenix, Arizona 85018
Facsimile No. (602) 840-8101

with copy to:  Robert P. Kaufman
General Counsel
Arena Management Group, LLC
4040 East Camelback Road, Suite 250
Phoenix, Arizona 85018
Facsimile No. (602) 840-8101

To the City:  City Manager
City of Glendale
5850 West Glendale Avenue
Glendale, Arizona 85301
Facsimile No. (623) 847-1399

<table>
<tr><td>with copy to:</td><td>City Attorney<br>City of Glendale<br>5850 West Glendale Avenue<br>Glendale, Arizona 85301<br>Facsimile No. (623) 915-2391</td></tr>
</table>

with copy to:    City Attorney
                 City of Glendale
                 5850 West Glendale Avenue
                 Glendale, Arizona 85301
                 Facsimile No. (623) 915-2391


To the Team:     Steven Ellman
                 Coyotes Hockey, LLC
                 4040 East Camelback Road, Suite 250
                 Phoenix, Arizona 85018
                 Facsimile No. (602) 840-8101


with copy to:    Robert P. Kaufman
                 General Counsel
                 Coyotes Hockey, LLC
                 4040 East Camelback Road, Suite 250
                 Phoenix, Arizona 85018
                 Facsimile No. (602) 840-8101

Any party hereto may from time to time, by notice given to the other parties pursuant to the terms of this Section 11, change the address to which notices, demands, disclosures, acknowledgments, consents, approvals, statements, requests, responses and invoices to such party are to be sent or designate one or more additional Persons to whom notices, demands, disclosures, acknowledgments, consents, approvals, statements, requests, responses and invoices are to be sent.

A party giving a notice, demand, disclosure, acknowledgment, consent, approval, statement, request, response or invoice under this Agreement shall, contemporaneously with the giving of the same, give a copy of such notice, demand, disclosure, acknowledgment, consent, approval, statement, request, response or invoice to each party hereto that is not a named recipient thereof.

12.    **Governing Law**

In all respects, including all matters of construction, validity and performance, including, without limitation, the rights and duties of the parties hereto, this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Arizona applicable to contracts made and performed in that state (without regard to the choice of law or conflicts of law provisions thereof) and any applicable laws of the United States of America.

13.    **Entire Agreement**

This Agreement and the Arena Management Agreement constitute the full and complete understanding and agreement of the parties hereto with respect to the matters that are the subject of this Agreement.    This Agreement replaces any and all previous representations,

understandings, and agreements, written or oral, relating to its subject matter. This Agreement and its terms may not be modified, changed or waived except in writing signed by both parties.

14. **Breach and Default**

If any party to this Agreement materially breaches any provision of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice of such breach from any other party to this Agreement, the breaching party shall be in default; provided that if such matter cannot reasonably be cured within such thirty (30) day period, the breaching party shall not be in default if, within ten (10) days of receiving the original written notice of breach, it begins to cure the breach, in good faith continues to attempt to cure the breach, and thereafter cures such breach within one hundred twenty (120) days after receiving the original written notice of breach. In the event any party breaches this Agreement and does not cure the breach within the time specified within this Section, the other party's sole remedy shall be an action at law for actual monetary damages, but not consequential or punitive damages.

[Signatures on Following Page]

IN WITNESS WHEREOF, the parties have hereunto set their hands to be effective as of the Agreement Effective Date.

**ARENA MANAGER**:

ARENA MANAGEMENT GROUP, LLC,
a Delaware limited liability company

By:    Arena Management Services, Inc.,
an Arizona corporation,
its manager

     By: _____
     Name: _____
     Its: _____

**TEAM:**

COYOTES HOCKEY, LLC,
a Delaware limited liability company

By:    Arizona Hockey Management, Inc.,
an Arizona corporation,
its manager

     By: _____
     Name: _____
     Its: _____

**CITY**:

ATTEST:            **CITY OF GLENDALE,**
an Arizona municipal corporation

_____    By:_____
City Clerk          Name:_____
               Its:_____

APPROVED AS TO FORM:

_____
City Attorney